

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

NO. PD-1283-09

**PABLO PADILLA, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
FROM THE THIRTEENTH COURT OF APPEALS
NUECES COUNTY**

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., WOMACK, JOHNSON, KEASLER, HOLCOMB, and COCHRAN, JJ., joined. PRICE, J. concurred. MEYERS, J., did not participate.

**O P I N I O N**

A jury convicted appellant of capital murder (murder during the course of a robbery or an attempted robbery), and, with the State not having sought the death penalty, appellant received the mandatory sentence of life in prison without the possibility of parole. *See* § 12.31(a)(2), TEX. PENAL CODE. The ground upon which we granted review asks, "Did the Court of Appeals fail to follow Texas jurisprudence in erroneously affirming Petitioner's conviction because the evidence is legally

and factually insufficient to support a conviction as a principle [sic] or a party to capital murder?" *See Padilla v. State*, No. 13-08-470-CR, slip op. at 7-11 (Tex.App.–Corpus Christi, delivered August 20, 2009) (memorandum opinion not designated for publication) (deciding that the evidence is legally and factually sufficient to support appellant's capital-murder conviction). We address only the legal-sufficiency question and decide that the evidence is legally sufficient to support appellant's conviction. *See Zuliani v. State*, 97 S.W.3d 589, 593 (Tex.Cr.App. 2003) (this Court is without jurisdiction to review evidence for factual sufficiency in non-death-penalty cases).

The evidence in this case shows that the murder victim (Victor Morales) sold small quantities of drugs from his home in Corpus Christi. The victim's wife (Traci Romero) testified that the victim did this on the side "besides the roofing work" that he did. Romero did not like the victim's drug-dealing activities, and they argued over it. They even separated over it for about two or three months. They got back together about three months before the offense with the understanding that the victim "wasn't going to do anymore of those drug-dealings." The victim, however, apparently continued his drug-dealing activities, the extent of which he apparently kept secret from Romero. The night before the offense, the victim told Romero that a person named Carlos Gonzales owed him $1,000. This caused Romero and the victim to argue. Romero testified that she had seen Gonzales at their home about a year before to buy drugs from the victim.

The next morning, Romero went to work, leaving the victim home alone. When Romero returned home at about 5:20 p.m. that evening, she found the victim dead lying in a pool of blood on the floor by the front door. Their bedroom had been ransacked, and jewelry was missing. The victim's pit-bull dog was in the back yard. Romero testified that the dog was very protective of the victim. She also testified that the victim usually kept the dog in the house when he was home alone,

but that he would put the dog in the back yard when a stranger came to the house.

The medical evidence shows that the victim was severely beaten about the head and the neck and that his skull had been fractured.[1] The medical examiner testified that the victim's skull fracture

---

[1] The medical examiner described the victim's injuries:

The right upper forehead, this upper forehead area on the right, there was a two-inch round bruise. The right side of the head, in what's called the "right parietal area," which is the side on this–right side of the head, there was a quarter-inch scrape or abrasion. The right periorbital area was around, the right side of the eye and going down to the right check [sic], to the right jaw and to right neck, all that area was diffusely reddened.

The mid front of the nose had a quarter-inch tear or laceration and the bone there at the nose was also broke. The right corner of the mouth, there was a half-inch tear at that location. The right side of the face at the right cheek had several areas where the skin had been scraped. They were ranging from an eighth of an inch to a quarter-inch.

The right lower side of the jaw, down at the lower jaw, had an inch and a half tear. The upper lip, would be upper lip, but near where the gum line is, there was a half–there was a one-inch laceration, there. And the right upper dentition, the teeth at right upper part of the jaw, those were–there was areas where they were broken and there was also–they had come loose from their anchorage or where they're attached. The lower lip had two tears, one that was a half-inch, that was toward the outside part and then one that was an inch toward, more towards the center part.

The right side of the neck, this, all this area here, it's a muscle in that area called the "sternocleidomastoid muscle" that was bleeding into that right side of the neck. And at the left side of the neck, there is a bone that's in the neck area, it's called the "hyoid bone," that bone was also broke on the left side of the neck.

The left backside of the head behind the left ear had an area where there was a quarter-inch scrape, then the mid back of the head, just the mid back, going toward the right parietel area, there was a five-inch depressed area where there was multiple skull fractures, pretty much like an egg shell that had shattered right there, five-inches. Then the scalp overlying that area, there was bleeding at the scalp. When you reflect the scalp off the head, there was bleeding of the scalp and that was at the right forehead and at the back of the head.

would have been immediately incapacitating and would have caused death within about fifteen to thirty minutes. The medical examiner also testified that the injury to the victim's skull was consistent with having been caused by a blunt instrument such as a baseball bat or some other tool and that the injuries to the victim's neck, nose, mouth, cheeks and jaws were consistent with the victim having been kicked. The medical examiner also stated that all of the victim's injuries "could have been made by a single instrument" and that they "could have all been done by one person." The medical examiner further testified that there was "no way of telling how many people were involved in the infliction of these injuries."

Within about a week after the offense, the police discovered that appellant and Gonzales had been involved in pawning the victim's jewelry.[2] Appellant and Gonzales lived in Mathis, which was about an hour's drive from Corpus Christi, where the victim lived. The police arrested appellant and Gonzales.

About six months later, appellant provided a videotaped statement to the police in the

---

The left and right parietel bones, the left side of the head and the right side of the head, there was fractures of both bones. And then the occipital bone, which is the back and at the left area, and the left temporal bone, there was also some fracturing at that location.

The base of the skull, which is where the brain rests, the floor of the skull, there was fracturing at the–at the floor of the skull toward the front on the right and at the middle floor of the skull. The bottom of the brain, or the undersurface of the brain, that also had some bruises at the right and left front part of the brain and where the–the temporal bone is at the left and right bottom portions of the brain.

[2] Gonzales's girlfriend (Roxanne Marez) testified at appellant's trial that she twice accompanied appellant and Gonzalez to a pawn shop in San Antonio where appellant pawned some jewelry. Marez testified that appellant and Gonzalez "avoided" answering her question to them about where the jewelry came from.

presence of his attorney and the prosecuting attorney. Appellant stated in this videotaped statement that Gonzales was one of his "closest friends."[3] Appellant stated that Gonzales had been to the victim's home before and that he thought that Gonzales was getting his drugs from the victim. Appellant also stated that he went with Gonzales once before to the victim's home, but that he waited in the car while Gonzales went inside.

Appellant stated that he and Gonzales were riding around in Gonzales's mother's car smoking marijuana on the day of the victim's murder. Gonzales was driving the car. For some reason, which appellant did not explain, Gonzales drove the car from Mathis to the victim's home and parked. According to appellant, Gonzales got out of the car and went inside the home while appellant waited in the car. Shortly thereafter, Gonzales came back to the car and told appellant to come inside the house. When appellant did so, he saw the victim's body which, according to appellant, caused appellant to go into a state of shock. Appellant claimed that he stood by the front door still in shock while Gonzales ransacked the victim's home and took money and jewelry. Appellant claimed that Gonzales told him that he struck the victim in the back of the head with a tire-checker tool.[4] Appellant and Gonzales drove back to Mathis in "complete silence." Appellant

---

[3]

Appellant also stated that he and Gonzales were "best friends" and that they were "like family."

[4]

Detective Garcia described a tire-checker tool:

Q. [STATE]: Okay. How does–What is the purpose for this tool when it's used as it's intended?

A. [GARCIA]: It's used by truckers. Trucks and the trailers have tires that are inside, where you can see them. And inside, they use to thumb on the tire to determine whether it's got enough air or not. The sound emitted by the device will tell the trucker that the tire's inflated or if it's flat. And it keeps him from getting dirty, when

helped Gonzales dispose of evidence at an abandoned caliche pit in Mathis including four or five

pairs of gloves and the tire-checker tool (State's Exhibit 31), which the police recovered. Appellant

stated that Gonzales gave him some cash and some of the victim's jewelry. Appellant claimed that

he was afraid of his good friend Gonzales and that he pawned some of the victim's jewelry for

Gonzales because Gonzales told appellant that he did not have a driver's license.[5] Appellant later

said that both he and Gonzales pawned the victim's jewelry. Appellant claimed that he did not know

that Gonzales planned to kill the victim when they parked in front of the victim's home.[6]

Appellant claims on discretionary review that the evidence is legally insufficient to show that

---

he's going around checking his truck to make sure it's fit for the highway.

Q. Okay. Is it pretty heavy?

A. Yes, sir. I'd say about eight pounds.

[5]
The State presented evidence that Gonzales did have a driver's license.

[6]
The jury also heard a jail-recorded telephone conversation between appellant and Gonzales's girlfriend (Marez). According to appellant's attorney during closing jury arguments, appellant sounded like a "little thug" during this telephone conversation. Appellant's attorney stated:

Let's talk about the other side, the jail recording the phone call, where he sounds like a little thug. Gosh. Don't talk like that. Ah, I speak a certain way, you speak a certain way, in various context. When I'm at home with my three-year-old we talk about his toesies and his shoesies. And I would not quite be embarrassed, but pretty, yeah maybe embarrassed if there was a recording played for you of me talking about his poor wittle toesies. That's linguistics. Come on. You use the language that people expect you to. If I go back to West Texas and talk to my family there, it's y'all's and all kinds of deep Texas stuff.

This recording that he did, statement, required a different level of formality. And he understood that. And he also understands that his friends expect him to speak and communicate in a certain way. And if he did it differently, he wouldn't be in that group. He would not be in that group. These are people that he–This is his family.

he is guilty, either as a principal or as a party, to murdering the victim.[7]  He further argues that

whomever the evidence shows murdered the victim, the evidence also shows that the robbery was

an afterthought and not related to the victim's murder.[8]  Appellant argues:

> In affirming Padilla's conviction for capital murder, the Court of Appeals summarily relies on (1) mere presence (not sufficient alone to support a conviction); (2) "flight" in that he left the crime scene with the co-defendant (not sufficient alone to support a conviction); (3) splitting the proceeds from the theft and (4) pawning the victim's jewelry after the fact.  Obviously, none of these factors relate to a robbery in the course of murder or the murder itself; they are completely consistent with Padilla's complicity in a theft that occurred *after* the murder was completed by Gonzales.

(Citation to Appendix omitted; emphasis in italics in original).

Under a legal-sufficiency review, the reviewing court must view the evidence in the light

most favorable to the jury's verdict and then determine whether any rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt.  *See Jackson v. Virginia*, 443

---

[7]

The jury was authorized to convict appellant of capital murder either as a principal or as a party.  The parties' portion of the charge provided:

> Under the law of parties, if you find from the evidence beyond a reasonable doubt that on or about the 22nd day February [sic], 2007, in Nueces County, Texas, Carlos Gonzales, did then and there intentionally or knowingly cause the death of an individual, Victor Morales, by striking Victor Morales with a tire checker tool while in the course of committing or attempting to commit Robbery; and that the defendant, PABLO PADILLA, then and there knew of the intent, if any, of said Carlos Gonzales to cause the death of, Victor Morales, by striking Victor Morales with a tire checker tool while in the course of committing or attempting to commit Robbery, and the defendant, PABLO PADILLA, acted with intent to promote or assist the commission of the offense by Carlos Gonzales by encouraging, directing, aiding, attempting, or attempting to aid Carlos Gonzales to commit the offense as alleged herein, then you will find the defendant, PABLO PADILLA, guilty of Capital Murder as charged in the indictment.

[8]

*See Ibanez v. State*, 749 S.W.2d 804, 807 (Tex.Cr.App. 1986) (a killing followed by unrelated taking of property is not capital murder).

U.S. 307, 319 (1979). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *See id*. Faced with a record of historical facts that support conflicting inferences, the reviewing court "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *See Jackson*, 443 U.S. at 326. A "mere modicum" of incriminating evidence cannot "by itself rationally support a conviction beyond a reasonable doubt." *See Jackson*, 443 U.S. at 319.

We decide that a rational trier of fact could have found beyond a reasonable doubt that appellant willingly and actively participated in the victim's murder during the course of a robbery with his "best friend" Gonzales, who owed the victim $1,000. The evidence shows that these "best friends" made the approximately one-hour drive from Mathis to the victim's home in Corpus Christi where the victim was brutally murdered just minutes after their arrival. The victim's pit-bull dog was in the back yard when the victim's wife returned home from work. She testified that the victim would put the dog in the back yard when a stranger came over. This is some evidence that at least one stranger was in the house. And, even though the medical examiner testified that he could not say how many people attacked the victim, the medical examiner's testimony does support a finding that the victim could have been attacked by two people.

The evidence also shows that money and jewelry were taken from the victim's home immediately after the victim was attacked. *See Cooper v. State*, 67 S.W.3d 221, 223-24 (Tex.Cr.App. 2002) (theft occurring immediately after a murder will support an inference that the murder occurred during the course of a robbery). The evidence further shows that appellant helped Gonzales dispose of evidence, that appellant and Gonzales split up the victim's money and jewelry,

and that appellant and Gonzales were involved in pawning the victim's jewelry. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Cr.App. 2007) ("In reviewing the sufficiency of the evidence, we should look at events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.") (internal quotes and citation to other authority omitted); *see also Wilson v. United States*, 162 U.S. 613, 619-20 (1896) (in a prosecution for murder, possession "of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and, though only prima facie evidence of guilt, may be of controlling weight, unless explained by the circumstances or accounted for in some way consistent with innocence").

In addition, a rational trier of fact could have found that appellant was less than truthful about his involvement in the offense when he made the videotaped statement to the police. A rational trier of fact could have disbelieved appellant's claim that his best friend, Gonzales, would take a completely innocent-bystander witness with him while Gonzales committed a capital murder.[9] A rational trier of fact could also consider such untruthful statements by appellant, in connection with the other circumstances of the case, as affirmative evidence of appellant's guilt. *See Wright v. West*, 505 U.S. 277, 296 (1992) (jury could disbelieve defendant's "uncorroborated and confused

---

[9] The State argued during its closing jury arguments:

What did [appellant] tell you about his relationship with [Gonzales]? They go into each other's homes without knocking. They go wake each other up from a sound sleep and say, "Come on, Dude, let's roll." That's what we know about their relationship. If you're gonna go commit a murder, do you take a witness with you? No. You take somebody to watch your back. And who are you gonna take to watch your back? [Gonzales] is gonna take somebody like that man, right there. And that's who he did take.

testimony" and jury "was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt"); *Wilson*, 162 U.S. at 620-21 ("Nor can there be any question that, if the jury were satisfied, from the evidence, that false statements in the case were made by defendant, or on his behalf, at his instigation, they had the right, not only to take such statements into consideration, in connection with all the other circumstances of the case, in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense, made or procured to be made, as in themselves tending to show guilt."); *Dyer v. MacDougall*, 201 F.2d 265, 268-69 (2nd Cir. 1952). In *Dyer*, 201 F.3d at 268-69, the Court explained:

> It is true that the carriage, behavior, bearing, manner and appearance of a witness–in short, his 'demeanor'–is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. They may, and indeed, they should, take into consideration the whole nexus of sense impressions which they get from a witness. This we have again and again declared, and have rested our affirmance of findings of fact of a judge, or of a jury, on the hypothesis that this part of the evidence may have turned the scale. Moreover, such evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.[10]

---

[10] The State also argues in its brief on discretionary review:

> In the present case, the jury was able to see and hear [appellant] on the recorded statement, including his calculating demeanor, and his self-serving and implausible attempt to shift the entire blame for the robbery and murder onto Gonzales. The jury should similarly be able to infer guilt by recorded demeanor, at least in cases like the present one where the defendant is present with one or more others during the commission of the crime and all that it [sic] lacking is some indication that he was either the primary actor or a participant.

* * *

We decide that the jury's verdict in this case is rationally supported by common sense, logical references from the circumstantial evidence, and legally sufficient evidence. It was not a verdict based on a "mere modicum" of incriminating evidence. *See Jackson*, 443 U.S. at 319.[11]

The judgment of the court of appeals is affirmed.

Hervey, J.

Delivered: October 6, 2010
Publish

---

Finally, common sense and reasonable inference [sic] suggest that the circumstances themselves are inconsistent with the possibility that [appellant] was simply an innocent bystander. The evidence suggests that this was not a spontaneous crime but a planned event. The two drove to the victim's house with no apparent reason other than robbery and murder, and one of them took the murder weapon into the victim's house and promptly used it. While the presence of an innocent bystander may be plausible when the crime is a spur-of-the-moment or unplanned event, common sense suggests that you do not take an unsuspecting friend along to a planned murder, nor does that friend get a share of the booty when the murder has been completed.

[11] We find it unnecessary to address the State's claim that appellant indirectly confessed by way of an "adoptive admission" when he stated, during the jail-recorded telephone conversation with Gonzales's girlfriend (Marez), that Gonzales "snitch[ed] on him." The State claims that appellant's use of the term "snitch" was an implied admission by appellant of his involvement in the crime.