NUMBER 13-10-00369-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI -
EDINBURG 


                                                                                                                     


 

RAFAEL CAMACHO,                                                          
    Appellant,

 

v.

 

THE STATE OF TEXAS,                         
                            Appellee.

                                                                                                                     
  

 

On appeal from the 105th
District Court 

of Nueces County,
Texas.

  
                                                                                                                   

 

MEMORANDUM OPINION

 

Before Chief Justice
Valdez and Justices Rodriguez and Garza  

Memorandum Opinion by
Justice Rodriguez

                                                                                                                                    

 

Appellant Rafael Camacho challenges his
conviction for failing to stop and render assistance, a third-degree felony.  See Tex. Transp. Code Ann. ' 550.021
(West Supp. 2010), ' 550.023 (West 1999).  Camacho
pleaded not guilty, and his case was tried to a jury.  At the close of the
State's case, the trial court denied Camacho's motion for directed verdict. 
The jury found Camacho guilty and sentenced him to four years in the Texas
Department of Criminal Justice, suspended for ten years of community supervision. 
By two issues which we will address as one, Camacho argues that the evidence
was insufficient to convict him.  We affirm.

I.  Background[1]

            Mark Benavides testified that on August 18,
2009, around 4:30 or 4:45 p.m., he was driving along Bauer Road in Robstown,
Texas when he saw Sandra Zarafonitis[2]
lying on the side of the road in a field.  When Benavides stopped and got out
of his car, he observed that a white Ford F-250 truck parked on the other side
of the road "just booked it and took off," going about three to four
blocks on Bauer before turning right onto Power Plant Road.  Benavides
explained that he recognized that same truck in a surveillance video shown to
him by the detectives.  On cross-examination, Benavides testified that, in his
statement to police, he described the vehicle as an "older model heavy
duty pickup truck" and that he told a man who called 9-1-1 only that it
was a white truck.  Benavides testified that after he saw the media coverage
that said it was an F-250, he agreed.  Benavides also testified that he came up
on the truck from the back and stopped before he got to its window; he
"couldn't see [through the back part of the truck] because [he was] lower
than what the truck was," and he did not see anyone in the truck.

            Max Mesa testified that on August 18, 2009,
at about 4:00 in the afternoon, he was driving north on Bauer Road when a big
white truck that looked like a Ford passed him going about fifty miles an hour
in a thirty-mile-per-hour speed zone.  It turned onto Power Plant Road.  Mesa
explained that he then passed a man getting out of his car.  Mesa turned his
vehicle around to see if he could help.  When he saw that the man was holding a
woman, Mesa called 9-1-1.  On cross-examination, Mesa agreed that he told the
9-1-1 operator that the truck that left the scene was a Chevy truck based on
information provided to him.

Robstown Patrolman Carlos Pena testified
that he was the first officer on the scene.  During Officer Pena's testimony,
when the State offered his accident scene diagram as an exhibit, the defense
asked that Officer Pena's entire traffic accident report be offered.  The State
agreed to do so, and trial court admitted the complete report as State's
Exhibit 58.  Officer Pena testified that the report alleged the offense of
failure to render aid, a felony charge.  Officer Pena also testified that six
or seven days after the traffic accident, after speaking with Detective Enrique
Paradez, another investigating officer, he also named Camacho in the report
because he believed him to be a suspect.  The report identified Camacho as the
driver and owner of the 2002 white Ford F-250 pickup that struck Zarafonitis
from behind and left the scene of the accident.  Camacho requested no limiting
instruction concerning the representations made in that accident report.  Officer
Pena also testified that, based on his experience and his investigation, he
believed a motor vehicle struck Zarafonitis.[3]

            Martin Flores, a detective with the Robstown
Police Department, testified that when he was called to investigate the case,
he went immediately to the hospital where he was informed that Zarafonitis had
died.  According to Detective Flores, he visited the scene of the accident the
next day and viewed surveillance videos from surrounding properties.  Detective
Flores testified that the surveillance videos showed "a white pickup truck
leaving the scene at a high rate of speed."  He also testified that
"the same truck was seen on every surveillance video" that was
reviewed.  The truck was shown heading south on Bauer Road, turning west onto
Power Plant Road, and then heading south again on Fourth Street.  When
Detective Flores contacted Maria Torres, Camacho's wife, she was "very
upset, crying, emotional, [and] shaking," and she provided relevant
evidence in the case.

Detective Flores also testified that
Camacho lived less than two miles from Fourth Street and Power Plant Road. 
After Camacho's vehicle became the suspect vehicle, Detectives Flores and Paradez
went to Camacho's home and to Benito Garza's Wrecker Service and Salvage Yard,
where Camacho worked, but did not find the vehicle in either location.  After
Camacho was developed as a suspect, Detective Flores attempted to locate him at
his residence on numerous occasions—more
than ten times—but found no one at home.

On cross-examination, Detective Flores
testified that the pickup on the videotape did not have lights on the top.  He
received a vehicle identification number (V.I.N.) from Benito Garza (Garza), Camacho's
friend and employer who sold Camacho a white Ford truck, and ascertained that
the V.I.N. was from a pickup that belonged to Camacho.  When he ran that number
through the police office's system, Detective Flores found that the vehicle was
a white Ford F-250.

Investigating Officer Paradez testified
that after receiving an anonymous call on August 22, 2009, he went to Garza's Wrecker
Service in Robstown, Texas and talked with Garza, the owner.  He also made
contact with Rosendo Del Rio who worked at the wrecker service.  Garza informed
Detective Paradez that he knew Camacho.  He provided Detective Paradez with information
on the case, particularly information regarding the vehicle.  Detective Paradez
also explained that Camacho lived a short distance from where Zarafonitis was
hit—only
three or four blocks.  On August 24, 2009, Camacho's wife was parked at her
daughter's house which is located near her own residence.  When Defective
Paradez made contact with her, she got nervous, started crying, and had
relevant information regarding the case.  Moreover, Detective Paradez testified
that Camacho did not turn himself in; rather, Camacho was found in Del Rio,
Texas, in February 2010.

Detective Paradez testified that he,
too, reviewed the surveillance video in this case.  According to Detective
Paradez, the surveillance came from different locations, one video from the
Power Plant, a second from the Tower Plant area.[4] 
In his opinion, the truck shown on the surveillance video was a Ford F-250 and belonged
to Camacho; it fit the description of the truck based on the information
provided to him by the Texas Crime Information Center (T.C.I.C.) and by Garza who
sold an F-250 to Camacho.  On cross-examination, when asked if the truck in the
video had "five big yellow lights on top of it," Detective Paradez
answered, "Not that I could see."  Detective Paradez acknowledged
that the witness at the scene claimed the truck was a Chevrolet, but he never
looked for a Chevrolet truck because once he saw the video of the truck that
fled the scene and was told by some of the utilities workers who were almost
hit by that same vehicle that it was a Ford truck, he knew it was not a
Chevrolet.

            Phillip Richard, who monitored surveillance
video at a site close to the scene of the accident, testified that a recording made
between 4:00 and 4:30 p.m. on the day of the accident showed a white Ford
pickup traveling south, and a second recording showed the pickup turning left
from Power Plant Road onto Fourth Street.  On cross-examination, Richard
testified that a number of farmers and others drive white trucks down Power
Plant Road, Bauer, and Magee.  Water plant employees also drive white company
vehicles, including Chevrolets and Fords.  However, according to Richard, the
company trucks are marked very noticeably with Nueces County Water Control
Improvement District, and he did not see any markings on the truck identified
as the suspect vehicle.  Richard testified that he could not see a license
plate or identify a driver from the videos, but he recalled seeing a single
person in the truck on the second video.  

            Three witnesses who worked for Robstown
Utilities came forward after the surveillance footage was shown on the local
news.  Ricky Guzman, Christopher Garza (Chris), and James Carrillo testified
that they remembered passing a truck that approached them from the opposite direction. 
Guzman testified that around 4:30 on the day of the incident, immediately after
he and Chris turned off Fourth Street onto Power Plant Road, he noticed a
standard white pickup truck traveling at a high rate of speed on Power Plant
Road.  Guzman described Power Plant Road as a narrow road with "a lot of
potholes and a lot of dips and bumps," i.e., a road on which you would
normally drive only fifteen or twenty miles per hour.  Guzman saw two people in
the truck as it passed his vehicle.  He described the driver as an overweight,
husky looking "moreno," or dark-skinned Hispanic male, in his late
thirties or early forties, who had shaggy, scruffy-looking hair, a full, unkept
beard, and a mustache.  Guzman also agreed that he had described the driver's
hair as "clean cut" in his statement to the police but explained that
it was a "typo" and did not know "why they put that on
there."

            Chris testified that he was traveling with
Guzman from their job site when he noticed a white truck coming toward them.  According
to Chris, the truck, a Chevrolet or a Ford, was "coming real fast, it was
kicking up dust," and he told Guzman to "watch out for that
truck!"  Chris saw two individuals in the truck.  He described the driver
as a big man, "a little more than chubby," with
protruding eyes, a wide nose, a beard, a round chin, short hair, and
"somewhere in his forties, over thirty-five for sure."

Carrillo testified that, on August 18,
2009, at 4:30 p.m., he was returning from a job site to the warehouse when he
turned off Fourth Street onto Power Plant Road and saw "a vehicle coming
at a high rate of speed toward [him] so [he] had to kind of swerve out of the
way a little bit to avoid a collision."  According to Carrillo, the
vehicle was a white Ford pickup and there was nothing unusual about the
lighting system.  Carrillo saw a dark-complexioned man in the truck.  Carrillo
testified that he saw the surveillance video when it was aired on the news; it
showed his vehicle turning right, another company vehicle ahead of him, and a
white vehicle that passed them from the opposite direction.  Neither Carrillo,
Guzman, nor Chris identified anyone in the court room, including Camacho, as
the driver of the suspect vehicle.

Sylvia Quinones testified that she had
known Camacho for fifteen years through her family and that he was married to a
distant cousin.  After seeing the footage on the news, Quinones came forward
and gave a statement to the police.  Quinones testified at trial that she did
not recall giving this statement.  She also admitted to having mental problems
and being on medication when her statement was given in August 2009.  Without
objection, however, the prosecutor read Quinones's prior statement into the
record.  In her statement, Quinones indicated that, when she saw a news story
involving the accident and the suspect truck, she "immediately thought
that it belonged to a male subject by the name of Rafael Camacho."  The
defense did not ask for a limiting instruction concerning this statement.

            Garza testified that Camacho worked for him
"[o]n and off for about 13 years."  Garza considered Camacho a friend
and sold him a white 2002 Ford three-quarter-ton pickup early in August 2009.  When
asked if he remembered what Camacho looked like in August 2009, Garza
responded, "[H]e looked like what he looks now. . . .  He
would have facial hair on and off. . . .  He would go without
shaving for a while and then all of a sudden he'd shave.  He might shave his
whole head . . . ."  Garza testified that Camacho drove the
truck every day.  According to Garza, on August 18, 2009, Camacho was laying
cement for a carport at Garza's home, which is located off of Magee and approximately
twenty miles from the water plant.  He stated that Camacho worked a full day on
August 18 and would usually work until 4:00 or 5:00 p.m., sometimes later.  The
last time Garza saw Camacho was on August 19, 2009, when Camacho told him that
his father, who lived in Mexico, was very ill and that he needed to go see
him.  Based on this information, Benito assumed Camacho was going to Mexico.  Garza
testified that Camacho has not worked for him since that day, and his carport
is like it was when Camacho left. 

On cross-examination, Garza testified
that Camacho's truck had five yellow clearance lights on top of the roof the
last time he saw it on August 19, 2009.  When asked to review the title to
Camacho's vehicle and an attached document,[5]
Garza testified that "it shows that [Camacho's] vehicle had, it says,
'Roof lights, clearance lamps.'"  When shown Defendant's Exhibit 2, an
enlarged photograph of the suspect vehicle taken from the surveillance video, Garza
testified that the vehicle in the photograph looked "like any Ford
truck," he did not "see any clearance lights on that truck," and
"[t]hey should be visible on top of the roof."  On re-direct, Garza again
explained that the clearance lights on Camacho's truck were on the front of the
roof—a
couple of inches above the windshield on the front of the cab.  When asked if
he "would agree . . . that there's a possibility that Mr.
Camacho removed this lighting system that they think [is] on it?", Garza
answered, "I don't think so.  I don't agree with you . . .
because I would have noticed the lights gone if there is a hole there." 
Garza also testified that the last time he saw Camacho was "not this
weekend, the previous weekend" before trial and that he had provided
financial assistance to Camacho in the past.[6]

            After the State rested and after the trial
court denied Camacho's motion for directed verdict, Del Rio testified for the
defense.  He explained that Defendant's Exhibit 2 did not look like the truck
he worked on before it was sold to Camacho because it did not have cab lights
and the handle did not open like the one on Camacho's truck.  Del Rio explained
that he had reviewed the surveillance video with Detective Paradez and had told
him that the truck in the video did not look like that truck.  Del Rio also
testified that Camacho looked the same in court as when he last saw him in June
of 2009 except that he did not have a mustache.  When asked why he said Camacho
did not have a mustache, Del Rio responded that "he always have [sic] a
mustache."  The State also established that Del Rio had a long friendship
with Camacho and that the last time Del Rio spoke with Camacho was a month
before trial when they talked for approximately thirty minutes about things
other than business.

II. 
Standard of Review and Applicable Law

In a legal sufficiency review, we
consider the entire trial record, viewing the evidence in the light most
favorable to the verdict, to determine whether a rational jury could have found
the accused guilty of all essential elements of the offense beyond a reasonable
doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Brooks v. State,
323 S.W.3d 893, 912 (Tex. Crim. App. 2010); see Laster v. State, 275
S.W.3d 512, 517 (Tex. Crim. App. 2009); Williams v. State, 235 S.W.3d
742, 750 (Tex. Crim. App. 2007).  This "familiar standard gives full play
to the responsibility of the trier of fact fairly to resolve conflicts in the
testimony, to weigh the evidence, and to draw reasonable inferences from basic
facts to ultimate facts."  Padilla v. State, 326 S.W.3d 195, 200
(Tex. Crim. App. 2010) (quoting Jackson, 443 U.S. at 319).

The trier of fact then is the sole judge
of the facts, the credibility of the witnesses, and the weight given to
testimony.  Tex. Code Crim. Proc. Ann.
art. 38.04 (West 1979); Beckham v. State, 29 S.W.3d 148, 151 (Tex. App.—Houston
[14th Dist.] 2000, pet. ref'd).  We "may not re-evaluate the weight and
credibility of the record evidence and thereby substitute our judgment for that
of the [fact-finder]."  Williams, 235 S.W.3d at 750.  Instead, we
resolve any inconsistencies in the evidence in favor of the final judgment and
consider whether the jury reached a rational decision.  Curry v. State,
30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  An appellate court, faced with a
record of historical facts that supports conflicting inferences, must also
presume—even if it does not affirmatively appear in the record—that the trier
of fact resolved any such conflicts in favor of the prosecution, and must defer
to that resolution.  Jackson, 443 U.S. at 326; Padilla, 326
S.W.3d at 200.

Legal sufficiency is measured by the
elements of the offense as defined by a hypothetically correct jury charge.  Villarreal
v. State, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); Malik v. State,
953 S.W.2d 234, 240 (Tex. Crim. App. 1997).  A person commits the
offense of failure to stop and render assistance if (1) a driver of a vehicle,
(2) involved in an accident, (3) resulting in injury or death of any person,
(4) intentionally and knowingly, (5) fails to stop and render reasonable assistance. 
See Tex. Transp. Code Ann.
§§ 550.021, 550.023.

The instant conviction rests upon
circumstantial evidence.  Circumstantial evidence is sufficient evidence to
prosecute for failure to stop and render assistance.  Clausen v. State,
682 S.W.2d 328, 332 (Tex. App.—Houston [1st Dist.] 1984,
pet ref'd); see Earls v. State, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986)
(en banc) (setting out that the identity of a defendant can be proven by direct
or circumstantial evidence).  The law does not require that each
fact "point directly and independently to the guilt of the appellant, as
long as the cumulative effect of all the incriminating facts is sufficient to
support the conviction."  Hooper v. State, 214 S.W.3d 9,13 (Tex.
Crim. App. 2007).  So long as "the verdict is supported by a reasonable
inference, it is within the province of the fact[]finder to choose which
inference is most reasonable."  Laster, 275 S.W.3d at 323. 
And as
with any question of circumstantial evidence and inference, "the jurors
are free to use their common sense and apply common knowledge, observation, and
experience gained in the ordinary affairs of life when giving effect to the
inferences that may reasonably be drawn from the evidence."  Obigbo v.
State, 6 S.W.3d 299, 306 (Tex. App.—Dallas 1999, no pet.); see Saenz v.
State, 976 S.W.2d 314, 322 (Tex. App.—Corpus Christi 1998, no pet.)
("Jurors are expected to draw upon their own experiences and common
knowledge and apply them to the facts at hand."); Jones v. State,
900 S.W.2d 392, 399 (Tex. App.—San Antonio 1995, pet. ref'd).  "'[T]he
standard of review on appeal is the same for both direct and circumstantial
evidence cases.'"  Kuciemba v. State, 310 S.W.3d 460, 462 (Tex.
Crim. App. 2010).

 

II. 
Discussion

            By his sole issue, Camacho challenges the sufficiency
of the evidence to support his conviction for failure to stop and render
assistance.  Specifically, Camacho asserts that no reasonable juror could have
found beyond a reasonable doubt that he was guilty of failing to render
assistance because there was legally insufficient evidence to prove that he was
the driver of the vehicle that struck Zarafonitis.  Camacho argues that the evidence is legally
insufficient because no witness identified him as the driver of the vehicle
that hit Zarafonitis and because there was no eyewitness to the accident.

In this case, although Benavides, the
only person who saw a white truck leave the scene, did not see the driver of
the truck and none of the witnesses positively identified Camacho, three
witnesses at trial provided details about the driver's physical appearance. 
Guzman testified that the driver had shaggy hair, a scruffy beard and a
mustache, and was a husky, dark-skinned Hispanic male in his late thirties or
early forties.  Chris testified that the driver had a beard, protruding
eyes, a wide nose, and that he was a big man, "a little bit more than
chubby," with short hair, somewhere in this forties and at least over
thirty-five.  Carrillo testified that he saw a dark-complexioned man in the truck. 
In addition, Del Rio, a long time friend, testified that Camacho looked the
same in the courtroom as he did in July 2009 when Del Rio last saw him, except that
he did not have a mustache and he always had a mustache.

While no witness identified Camacho in
court, the law does not require in-court identification, and it is merely one
factor to consider in assessing the weight and credibility of a witness's
testimony.  Conyers v. State, 864 S.W.2d 739, 740 (Tex. App.—Houston
[14th Dist.] 1993, pet ref'd); see Sharp v. State, 707 S.W.2d
611, 614 (Tex. Crim. App. 1986); Meeks v. State, 897 S.W.2d 950, 955
(Tex. App.—Fort Worth 1995, no pet.).  Camacho was
present in court, and the jurors were free to compare his appearance with the
person described by the witnesses, to give probative weight to those
observations, and to give effect to the inferences that might
reasonably have been drawn from the testimony.  See Obigbo, 6
S.W.3d at 306; Jones, 900 S.W.2d at 399; see Saenz, 976 S.W.2d at
322.

Neither does the law require that each
fact "point directly and independently to the guilt of the appellant, as
long as the cumulative force of all the incriminating circumstances is
sufficient to support the conviction."  Hooper, 214 S.W.3d at 13; see
Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).  In this case,
in addition to the above, the police report, admitted
without objection as State's Exhibit 58, provided that Camacho was the driver
of the vehicle that struck Zarafonitis and then fled the scene.  Once admitted
without objection, hearsay enjoys a status equal to that of all other
admissible evidence.  See Poindexter, 153 S.W.3d at 409; see also Tex. R. Evid. 802 ("Inadmissible
hearsay admitted without objection shall not be denied probative value merely
because it is hearsay.").

The parties also stipulated that Camacho
owned a Ford F-250 white truck, and although there is conflicting testimony
regarding the make and model of the suspect vehicle, several witnesses
identified the vehicle traveling away from the scene at an unusually high rate
of speed for the condition of the road as a white Ford F-250 pickup truck.  Detective
Paradez, testified that, in his opinion, the truck on the video was a Ford F-250,
and based on information he received from the T.C.I.C. and from Garza, the
vehicle belonged to Camacho.  Furthermore, while Camacho emphasizes the alleged
differences between his truck and the truck seen in the surveillance videos,
here we are faced with a record of historical facts that
arguably supports conflicting inferences, and giving full play to the
responsibility of the fact-finder to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts, we must presume that the jury resolved this conflict in favor
of the prosecution.  See Jackson, 443 U.S. at 326; Padilla, 326
S.W.3d at 200; see also Tex. Code
Crim. Proc. Ann. art. 38.04; Beckham, 29 S.W.3d at 151.  For
instance, it was theorized by the State that the lights on the cab of Camacho's
truck could have been removed by Camacho, and based on the evidence before it,
the jury could have believed that theory.  It is also possible that the jury
did not believe Camacho's friends when they testified that Camacho's truck had
cab lights.  Instead, the jury could have concluded from the testimony of
Quinones,[7] the
investigating officers, and Carrillo that Camacho's truck was
the truck shown on the video and that the truck had no cab lights on the day of
the accident. 

Moreover, the jury also heard testimony
that Camacho lived close to where the accident occurred, and that on August 18,
2009, the day of the accident, he had been working at Garza's home, which was located
approximately twenty miles from the water plant.  Camacho had worked a full day
on August 18 and would sometimes work until 4:00 or 5:00 p.m.  The accident
occurred at approximately 4:30 p.m. that afternoon.  Also, immediate flight to
another location constitutes suspicious conduct tending to connect the
defendant to the accident.  See Gonzalez v. State, 115 S.W.3d 278, 283
(Tex. App.—Corpus
Christi 2003, pet. ref'd) (providing that flight to another city the day after
a murder was sufficient to corroborate the testimony of an accomplice). 
Camacho left for Mexico the day following the accident.  He explained to Garza
that he was going to Mexico because his father was ill.  However, when Camacho
was located six months later, he was in Del Rio, Texas, not in Mexico.  The
timing of his departure is an incriminating circumstance that a rational juror
might consider.  See Hooper, 214 S.W.3d at 13; also see Guevara,
152 S.W.3d at 49.  Finally, during their investigation, the police found no one
at Camacho's home on numerous occasions, and when the police did contact
Camacho's wife on one occasion shortly after the accident, she was emotional. 

Therefore, considering the entire trial
record and viewing the evidence in the light most favorable to the verdict, we
conclude the cumulative force of all the incriminating circumstances is
sufficient to support the conviction.  See Hooper, 214 S.W.3d at 13; see
also Guevara, 152 S.W.3d at 49.  A rational jury could have found beyond a
reasonable doubt that Camacho was the driver of the vehicle that hit
Zarafonitis and failed to stop and render assistance.  See
Jackson, 443 U.S. at 319; Laster, 275 S.W.3d at 517; Williams,
235 S.W.3d at 750; see also Tex. Transp. Code Ann. §§ 550.021, 550.023. 
And we must defer to the jury as to that resolution.  See Jackson, 443
U.S. at 326; Padilla, 326 S.W.3d at 200. 

We
overrule Camacho's sole issue.

III. 
Conclusion

            Accordingly, we
affirm the judgment of the trial court. 

 

                                                                                                             NELDA
V. RODRIGUEZ

                                                                                                             Justice

 

Do not publish.

Tex.
R. App. P.
47.2(b).

 

Delivered and filed
the  

23rd day of June,
2011.

                                                                                                                                                            

 









[1] Because this is a
memorandum opinion and the parties are familiar with the facts, we will not
recite them here except as necessary to advise the parties of the Court's
decision and the basic reasons for it.  See Tex. R. App. P. 47.4.

 





[2] "Zarafonitis" is
also spelled "Zarafonetis" and "Zarafontis" throughout the
record.  Camacho uses the spelling "Zarafonitis" in his brief.  For
consistency, we will do likewise.

 





[3] On cross-examination, paramedic Mark
Mireles who "worked a call for . . . Zarafonitis," agreed
that, in his report, he wrote that a "bystander said that the patient was
struck by a vehicle."  Mireles testified that a police office told him
that "it was an auto versus ped," and according to Mireles, "it
matched with what [he] saw."  In addition, Ray Fernandez, M.D., the
medical examiner who conducted the autopsy on Zarafonitis, testified that the
cause of her death was multiple blunt force injuries and the manner of her
death was classified as an accident which, in this case, was consistent with
being struck by an automotive vehicle.

 





[4] Without identifying
the location, Detective Paradez testified that there was a third camera that
took still photos.  Those photos do not appear in the record.





[5] This document,
described in the index to exhibits as a detailed vehicle report from Ford Motor
Company, was published to the jury but was not offered and admitted as a trial
exhibit.

 





            [6]
The Nueces County title registration record for Camacho's 2002 Ford F-250,
admitted as State's Exhibit 65, set out that Garza held a first lien on the
truck. 





[7] Quinones testified
that when she saw the news story involving the accident and the suspected
truck, she "immediately thought that it belonged to a male by the name of
Rafael Camacho."  The relevant portion of Quinones's statement was offered
into evidence, without instruction or limitation, such that it could have been
considered by the jury to be probative as if the witness herself had testified
to it in court.  See Poindexter v. State, 153 S.W.3d 402, 408–09 (Tex.
Crim. App. 2005); Tex. R. Evid.
105(a) (providing for the use of a limiting instruction), 802 (setting out the
hearsay rule).