

**NUMBER 13-19-00359-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI** – **EDINBURG**

---

**FELICIANO FLORES AVALOS JR.,**                                            **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                            **Appellee.**

---

**On appeal from the 370th District Court
of Hidalgo County, Texas.**

---

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Hinojosa and Silva
Memorandum Opinion by Chief Justice Contreras**

Appellant Feliciano Flores Avalos Jr. appeals his conviction for murder, a first-degree felony. *See* TEX. PENAL CODE ANN. § 19.02(b)(2). By three issues, Avalos argues (1) there is legally and factually insufficient evidence supporting the jury's rejection of his self-defense claim, (2) he received ineffective assistance of counsel, and (3) "cumulative errors made by trial counsel and the trial court denied . . . his right to a fair trial." We affirm.

## I. BACKGROUND

Julio Villarreal lived four houses down the street from Avalos's house in Pharr, Texas. On April 22, 2018, Avalos stabbed and fatally wounded Villarreal. In July 2018, Avalos was indicted for Villarreal's murder. He pleaded not guilty and expressed to the trial court his desire to represent himself at trial. The trial court reluctantly agreed and appointed counsel to assist him.[1]

At trial, the State introduced videos of the altercation between Avalos and Villarreal that resulted in Villarreal's death. The videos were captured by the home security cameras of two other neighbors. In one of the videos, Avalos can be seen pulling into his driveway and, shortly after, he is standing in front of his house gesturing aggressively in the direction of Villarreal. Avalos then goes inside the house and returns a few minutes later and walks into the street in front of his house, holds a knife in the air in the direction of Villarreal, and flips the blade open. Avalos closes the knife, puts it in his pocket, and walks around in his yard while gesturing again in the direction of Villarreal with his hands and arms. Avalos then appears to see Villarreal running towards him, stands in a fighting position with his hands down near his legs, and pulls the knife out again but waits for Villarreal to attack him. Villarreal kicks Avalos in the stomach and knocks him down to the ground. While Avalos is on the ground, Villarreal kicks him again, and after Villarreal makes impact with Avalos's leg, Avalos swings forward with the knife and slashes across Villarreal's right thigh, severing Villarreal's femoral artery. After the scuffle continues for a few seconds, Villarreal retreats to his home, where he died as a result of the injury.

---

[1] Where a defendant insists on self-representation, a trial court may appoint counsel to be available to assist him or her. *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975); *Rodriguez v. State*, 763 S.W.2d 893, 896 (Tex. App.—San Antonio 1988, pet. ref'd).

The State also presented testimony from multiple neighbors. Edward Pena lived "four to six houses" down the street from Avalos. He explained Avalos would listen to music so loud that he could hear it at his house and that he would stand in his front lawn, drink alcohol, and sing along to the music. Pena provided a video recorded six months prior to the murder in which Avalos says "we thrive on the murder."

Norma De La Cruz lived two houses down from Avalos. De La Cruz testified she went outside shortly after the altercation between Avalos and Villarreal and noticed "a lot" of blood in the street. Avalos then yelled at De La Cruz, "Do you want to die too, bitch?" According to De La Cruz, Villarreal was "very quiet."

Veronica Reyes lived next door to Avalos, and her surveillance system captured the video of the altercation. She explained the surveillance system was installed because of Avalos, and that Avalos threatened both Reyes and her husband. Reyes recounted an event in 2016:

> Avalos came—he got all the way to my driveway with—with a bottle in his hand, his arm raised. He got in front of me, and he broke the bottle in front of my feet. He saw that the police officers were coming. He kicked the—the truck, and walked away. And he starts yelling at me—He starts yelling at me that the life of my son belongs to him.

Reyes also recounted an event from 2018:

[State]:      What do you remember happening that day?

[Reyes]:      That afternoon, my husband was getting home from work, and [Avalos] started agitating him, wanting to start a fight with him. He would say vulgarities. I told my husband not to fall for his provoking. I didn't let him get into an argument.

[State]:      Was your husband the only person involved that day?

[Reyes]:      Orlando was outside, and Ms. Norma.

[State]:      And what do you remember [Avalos] telling you and Ms. Norma?

3

[Reyes]:        That he was gonna kill us.

[State]:        Okay. So this isn't—This video [with Villarreal] isn't the first time you've seen [Avalos] trying to entice a fight; is it?

[Reyes]:        Correct.

Alma Alejandro lived behind Avalos. Alejandro explained that, in September 2017, Avalos kicked her backyard fence in and stated to Alejandro: "Hey, bitch. I'm gonna kill you. Duck down. I'm gonna shoot you. I'm gonna kill you." Avalos was holding an object in his hand and threatened her with it.

Orlando Mendiola lived across the street from Villarreal. He explained he had "a lot" of incidents with Avalos and that Avalos was "confrontational" and would use profanity. Mendiola recounted that, in August 2016, Avalos was "yelling at me, and telling me he was gonna kill me." Mendiola explained Avalos tried to entice him to fight "multiple times" "on his property[,] and, sometimes, walking out into the roadway." Mendiola admitted he reacted to Avalos's instigations one time:

[State]:        Okay. What were the reactions. What happened?

[Mendiola]:     That one time, in particular, where I remember—I did go over to him, and told him that if he wanted to fight, for him to step out into the street.

[State]:        Okay. And why were you doing that? What was he saying?

[Mendiola]:     I was—I was tired of him.

[State]:        Okay. And what was he trying to get you to do?

[Mendiola]:     Trying to step into his yard.

[State]:        Okay. And why do you think he was doing that?

[Mendiola]:     So he could claim self-defense, pretty much, when the police probably would be called out there.

[State]:        Okay. So, I mean, was this the very first time he'd ever tried to get you to come to him?

4

[Mendiola]: That one instance—yes. I believe that's the first time.

[State]: Okay. Was there another one, in the exact same month, where the exact same thing happened?

[Mendiola]: Yes.

[State]: Okay. Same situation?

[Mendiola]: Yes.

[State]: What were you typically doing, in your household, when all these altercations start?

[Mendiola]: Either in the garage, or out watering the lawn.

[State]: Now, are you ever saying anything to Avalos? Are you responding to him? How does it always get to the point of him wanting to fight you?

[Mendiola]: Just him seeing me.

[State]: Okay. If you can, go ahead and describe what he was doing or what he was saying to try to get you to come over?

[Mendiola]: He'd ask me to go over there and fight him because—You know, if I wasn't a pussy—for me to go out there.

[State]: Okay. Was that the only bad word he would call you, or would he use other words?

[Mendiola]: Oh, a lot of bad words. I could name you a list of them.

[State]: Okay. So these are all things that he would do and he would say to get you to come over there and fight him?

[Mendiola]: He would call me a motherfucker. He would call me a cocksucker. He would tell me that I—I was a faggot. You know, saying that he was gonna fuck my wife. You know, a lot of things to try to entice me to respond to him.

[State]: But he never actually came to your property; right?

[Mendiola]: No.

[State]: No. He would always just kind of stop in the road?

[Mendiola]: Yes.

5

. . .

[State]:      Yeah. Did he ever—Did he ever use any weapons to gesture to you, to try to get you to come over?

[Mendiola]:   Broken bottles, knives—mostly knives.

[State]:      Okay. Well let's talk about the knives. Do you remember having an incident in January of 2017?

[Mendiola]:   January? Yes.

[State]:      Okay. And what was he doing with a knife?

[Mendiola]:   He was waving, telling me he was gonna kill me.

Mendiola recounted another instance when Avalos was "waving a knife, telling me that was gonna kill me and [Reyes's husband]." Footage from Mendiola's home security system was also introduced into evidence.

The jury found Avalos guilty of the offense and assessed punishment at life imprisonment in the Texas Department of Criminal Justice Institutional Division. This appeal followed.

## II.   SUFFICIENCY

By his first issue, Avalos argues the evidence is legally insufficient to support the jury's implied rejection of his self-defense claim.[2] Avalos does not challenge the sufficiency of the evidence to support the jury's finding of the essential elements of murder beyond a reasonable doubt.

---

[2] Avalos's first issue states that the evidence was legally and factually insufficient to support a finding of guilty for murder. Specifically, Avalos argues the jury erred in rejecting his claim of self-defense. We construe this as a challenge to the sufficiency of the evidence underlying the jury's implied rejection of Avalos's self-defense claim.

Furthermore, Avalos urges us to employ a factual sufficiency review of the jury's rejection of his self-defense claim. However, the Texas Court of Criminal Appeals has abrogated factual-sufficiency review in criminal cases. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). We follow the precedent of the Texas Court of Criminal Appeals, and reject Avalos's claim to review the factual sufficiency of the evidence. *See id.*; *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d at 913–14 (Tex. Crim. App. 1991).

### A. Standard of Review

We review the sufficiency of the evidence issue under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.— Eastland 2010, pet. ref'd). Legal sufficiency is measured according to a hypothetically correct jury charge. *See Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theory of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

In our review, we view the evidence in the light most favorable to the verdict to determine whether any rational finder of fact could have found (1) the essential elements of the offense beyond a reasonable doubt, and (2) against appellant on the self-defense issue beyond a reasonable doubt. *See Brooks*, 323 S.W.3d at 895; *Saxton*, 804 S.W.2d at 914; *Hernandez v. State*, 309 S.W.3d 661, 665 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *see also Obregon v. State*, No. 13-11-00185-CR, 2013 WL 4769381, at *2 (Tex. App.—Corpus Christi–Edinburg 2013, no pet.) (mem. op., not designated for publication). We defer to the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). When the record contains conflicting inferences, we presume that the trier of fact resolved any such conflicts in favor of the prosecution, and we must defer to that resolution. *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 326); *see Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991)

7

(noting that the jury "can choose to believe all, some, or none of the testimony presented by the parties").

**B.     Applicable Law**

The defense of self-defense provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a). A "reasonable belief" is defined as one that would be held by "an ordinary and prudent man in the same circumstances as the actor." *Id.* § 1.07(a)(12).

However, self-defense is not available to a defendant if the defendant provoked another individual's use of unlawful force, unless: (1) the defendant abandoned the encounter, or clearly communicated to the other his intent to do so reasonably believing he could not safely abandon the encounter; and (2) the other nevertheless continues or attempts to use unlawful force against the defendant. *Id.* § 9.31(b)(4); *see Elizondo v. State*, 487 S.W.3d 185, 196 (Tex. Crim. App. 2016) ("The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense."). A charge on provocation is required when there is evidence that: (1) the defendant did some act or used some words which provoked the attack on him; (2) such act or words were reasonably calculated to provoke the attack; and (3) the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other. *Smith v. State*, 965 S.W.2d 509, 513 (Tex. Crim. App. 1998).

8

On a self-defense claim, the defendant bears the burden of production and must bring forth some evidence to support the particular defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Once the defense is raised, the State bears the burden of persuasion to disprove the defense; however, such a burden requires only that the State prove its case beyond a reasonable doubt. *Id.* The State is not required to produce additional evidence rebutting self-defense. *Id.* The issue of self-defense is a fact issue the jury determines, and the jury is free to accept or reject any defensive evidence on the issue. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). When a jury finds the defendant guilty, there is an implicit finding against the defensive theory. *Zuliani*, 97 S.W.3d at 594; *see Saxton*, 804 S.W.2d at 914.

## C.    Analysis

Here, a hypothetically correct jury charge would instruct the jury that Avalos forfeited his right to self-defense if: (1) Avalos did some act or used some words that provoked the attack; (2) such acts or words were reasonably calculated to provoke the attack; and (3) the act was done, or the words were used, for the purpose and with the intent that Avalos would have a pretext for inflicting harm upon Villarreal. *See Elizondo*, 487 S.W.3d at 196; *Smith*, 965 S.W.2d at 513; *Pham v. State*, 595 S.W.3d 769, 770 (Tex. App.—Houston [14th Dist.] 2019, pet. granted).

As detailed above, Reyes's home security system captured the altercation from start to finish, and the video shows Avalos gesturing towards Villarreal with his hands in the air in what appears to be an aggressive manner and urging him to come over. Reyes and Mendiola both testified that Avalos attempted to incite fights. Mendiola testified about the way Avalos sought to incite fights with him by staying on his property and trying to get Mendiola to come over to him so that Avalos could claim self-defense, which is what

9

Avalos can be seen doing in the video when gesturing at times with his hands towards Villarreal. Avalos's behavior in the videos is strikingly similar to the description of his prior threats of death to neighbors. From this evidence, a rational jury could infer that Avalos sought out Villarreal with the intention of provoking Villarreal to attack him on his property so that he could have a pretext for inflicting harm upon Villarreal. *See Engel v. State*, No. 11-18-00225-CR, __ S.W.3d __, __, 2020 WL 5491100, at \*5–6 (Tex. App.—Eastland Sept. 1, 2020, no pet.); *Pham*, 595 S.W.3d at 779–80; *Rodriguez v. State*, 546 S.W.3d 843, 857–58 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd).

Viewing the evidence in the light most favorable to the verdict, we conclude the evidence was legally sufficient to support the jury's rejection of Avalos's self-defense claim. *See Brooks*, 323 S.W.3d at 895; *See Elizondo*, 487 S.W.3d at 196; *Pham*, 595 S.W.3d at 779–80.

We overrule Avalos's first issue.

### III.   INEFFECTIVE ASSISTANCE

By his second issue, Avalos argues he received ineffective assistance of counsel. Specifically, Avalos argues that his "self-representation at trial amounts to ineffective assistance of counsel as per the prevailing legal standard." We disagree.

A defendant in a criminal prosecution has a Sixth Amendment right to the effective assistance of counsel. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011) (citing U.S. CONST. amend. VI; TEX. CONST. art. I, § 10). However, a pro se defendant may not allege his own ineffectiveness. *Perez v. State*, 261 S.W.3d 760, 768 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd); *Rodriguez v. State*, 763 S.W.2d 893, 896 (Tex. App.—San Antonio 1988, pet. ref'd); *see Faretta v. California*, 422 U.S. 806, 834 & n.46 (1975).

Here, Avalos argues that "his own representation amounts to ineffective assistance because he permitting [sic] the State to introduce prejudicial and non-probative evidence during its case in chief." Because Avalos voluntarily chose to represent himself, he cannot argue he received ineffective assistance of counsel. *See Faretta*, 422 U.S. at 834 & n.46; *Perez*, 261 S.W.3d at 768.

We overrule Avalos's second issue.

## IV. "CUMULATIVE ERRORS"

By his third issue, Avalos argues that "the aggregate effect of the cumulative errors by the trial court and the ineffective assistance, argued supra, adversely affected his sacred right to a fair and impartial trial." We have already rejected Avalos's ineffective assistance argument, and apart from the sentence just quoted, Avalos does not identify the alleged errors by the trial court he claims were harmful. Thus, to the extent Avalos complains of other errors by the trial court, we conclude that such an argument has been waived. *See* TEX. R. APP. P. 38.1(i).

We overrule Avalos's third issue.

## V. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
25th day of February, 2021.

11