

## NUMBER 13-09-00696-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**STANFORD HARVEY,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

### On appeal from the 24th District Court
### of Victoria County, Texas.

---

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza**
**Memorandum Opinion by Justice Rodriguez**

Appellant Stanford Harvey was charged by indictment with the murder and capital murder of Melba Eileen Lott. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2003) (murder), § 19.03(a)(3) (West Supp. 2010) (capital murder). A jury found Harvey guilty

as a party to the offense of aggravated assault, a lesser-included offense of murder.[1]

*See id.* § 7.02(a)(2) (West 2003) (criminal responsibility for conduct of another) (West 2003); *id.* §§ 22.01(a)(1) (assault), 22.02(a)(2) (aggravated assault) (West Supp. 2010). Harvey pleaded "true" to repeat offender allegations, and the trial court, after hearing evidence, assessed punishment at forty-five years in the Texas Department of Criminal Justice—Institutional Division. By one issue, Harvey complains that the evidence was insufficient to sustain his conviction for aggravated assault. We affirm.

## I.  BACKGROUND[2]

### A.  State's Evidence

Clemencia Archangel testified that she met Harvey in January 2006 when she was out on the streets for three months smoking crack.[3] In March 2006, Archangel was in Cassandra Jones's room at the Economy Inn[4] with Harvey and his wife, Erica Harvey,

---

[1] In a separate trial, a jury found Bruce Lynn Hughes guilty of Lott's murder. *See Hughes v.* State, No. 13-09-00267-CR, 2010 Tex. App. LEXIS 2118, at *1 (Tex. App.—Corpus Christi, Mar. 25, 2010, no pet.) (mem. op., not designated for publication). Hughes was convicted of capital murder and sentenced to life imprisonment. *See id.* In this case, however, the jury apparently determined that the evidence established only that Hughes was guilty of aggravated assault and thus, under the law of parties, found Harvey guilty only of aggravated assault, a lesser-included offense of murder. Moreover, it is undisputed the aggravated assault was a lesser-included offense of murder in this case. *See Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999) (setting out that aggravated assault can be a lesser included offense of murder).

[2] Because this is a memorandum opinion and the parties are familiar with the facts, we will not recite them here except as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* TEX. R. APP. P. 47.4.

[3] According to Clemencia Archangel, at the time of trial, she was a prison inmate having been convicted for possession of a controlled substance. Archangel had other convictions, including one for involuntary manslaughter when she was fifteen years old.

[4] Archangel testified that the Economy Inn in Victoria, Texas, was a place where drug dealing and trafficking occurred and where "smokers" would rent rooms.

when she overheard Jones saying that Lott had been robbed.[5]   According to Archangel, Harvey reacted to the news by asking if "they know if [Lott] was robbed or what happened or the details?"   Archangel testified that Harvey, who appeared "a bit nervous," "was trying to find out what was going on."   Archangel also remembered telling Detective Tom Copeland that the next morning she saw Harvey in a black SUV with Bruce Lynn Hughes, who was later convicted of Lott's murder.   *See Hughes v.* State, No. 13-09-00267-CR, 2010 Tex. App. LEXIS 2118, at *1 (Tex. App.—Corpus Christi, Mar. 25, 2010, no pet.) (mem. op., not designated for publication).   Archangel also remembered telling Detective Copeland that she heard that Lott was receiving a tax refund and that Hughes and Harvey knew about the refund.   She testified that, before Lott's body was found, Harvey told her that Hughes killed Lott.   According to Archangel, Harvey told her that he told Hughes not to let Lott escape or get away; specifically, Harvey told her "that he told [Hughes] that if [Lott] didn't give him the money, to kill the bitch."   On one occasion when she and Harvey were smoking crack cocaine, Harvey also told Archangel that he was there when Hughes murdered Lott and that he smoked crack cocaine with Lott the night she died.   Harvey did not, however, tell Archangel that he did it.   When asked if she recalled Harvey saying anything about whether he or Hughes changed clothes that night, Archangel answered, "Upstairs, in his apartment."   Harvey also asked Archangel to go to Houston with him and told her that Hughes was on the south side of Houston.   Finally, when asked if she recalled Harvey ever telling her about Lott, Archangel testified that on one occasion when she and Harvey got into an argument, "he grabbed me and told me not to make him do what Bruce did to [Lott]."

---

[5] Archangel had heard of Lott, but did not know her.

Archangel admitted there had been occasions when she had not told the truth. On cross-examination, Archangel agreed that she made a statement to an investigator that "[she] would say anything to get out of jail." Archangel also confirmed that Harvey did not actually say some of the things she said he had told her. However, Archangel testified that "the things [Harvey] did say, I am saying on the stand right now."

Erica Harvey testified that she and Harvey had lived in an apartment on the second floor of Crossroads Apartments. According to Erica, Lott's apartment was downstairs. On the evening she went to the Economy Inn to tell Harvey that a body had been located in their complex, he asked her if they said it was a robbery. When asked if Harvey was concerned about a robbery being investigated, Erica answered, "He was high and I was high, and it was just a question that he asked. I think we were probably more concerned about getting our next high." According to Erica, that was the last day they lived at the apartment because they were evicted, her probation was revoked, and she did not see Harvey again but knew he was spending time with Archangel.

Stephanie Holt testified that, approximately two or three weeks after Lott's body was found, she approached authorities with information regarding Lott's death. At trial, Holt testified that she met Harvey in 1998 on the streets where they were both using drugs. Holt did not know Hughes, but did know Lott, Archangel, Erica, and Amanda Jo Walters, who was another close friend and associate of Harvey.[6] According to Holt, Archangel and Walters had romantic relationships with Harvey. She also knew that Harvey lived at the Crossroads Apartments, upstairs from Lott. Holt testified that Harvey

_____

[6] Amanda Walters testified against Hughes in his murder trial but when called to testify in Harvey's trial, she refused to do so. The State describes Walters as a co-defendant.

4

told her several things about the murder scene and Walters's role in the offense. He told her that there was a blood trail that led from downstairs up to his apartment, that there was blood all over, that it might have been done by somebody who was very strong because blood was higher up on the walls, and that all Walters had to do was get rid of the knife.[7] She took from this conversation that Harvey had seen Lott's murder. Holt also testified that although Harvey did not say he knew who murdered Lott, he "did say something about someone else being there that resembled somebody that looked like 'Fly,' which was a dope dealer out on the street." In court, Holt identified Harvey as the man from whom she had received this information.

On cross-examination, Holt testified that she knew about the discovery of Lott's body because she drove by the apartments the day after it had been found. Holt further explained that Harvey first told her about the knife, but that Walters also told her that Harvey told her to get rid of it.

Lott's older brother, Milton Lott Jr., testified that he was aware of the rocky relationship between his sister and Hughes. Milton did not know Harvey. On cross-examination, Milton testified that his sister did not file a tax return the year she died, suggesting that a tax refund could not have been a motive for any alleged robbery. He did, however, offer that the motive could have been her payroll check.

Elizabeth Peacock, M.D., the medical examiner who performed the initial autopsy

---

[7] It is undisputed that a knife was used during the assault. Hughes testified that Lott retrieved a butcher knife from the kitchen. Investigating officers found a knife under Lott's bed. And there was testimony that Harvey carried a knife with a broken tip. It is irrelevant to our analysis as to what knife was involved; rather, what is relevant is that Harvey commented on the need for Walters to get rid of the knife.

5

on Lott, found that Lott died of cocaine toxicity. She also found blunt force trauma and ruled that the manner of death was an accident. Dr. Peacock testified that she thought her conclusions were valid based on the information she had at the time.

David Dolinak, M.D., the medical examiner who performed the second autopsy on Lott's body after exhumation, testified that based on the totality of the case, including the history, autopsy findings, investigative information, laboratory information, and toxicology results, his opinion was that Lott died as the result of homicidal violence.

Robin Castro, a forensic scientist, testified that Harvey was excluded from all blood stains examined and from all items reviewed for DNA from inside Lott's apartment. Bryan Strong, another forensic scientist, testified that he was able to develop one latent print off of a white plastic bag wrapped around a 24-ounce aluminum beer can (State's Exhibit 17) found on an upstairs windowsill of the apartment complex where Lott's body was found. He determined that the print was Harvey's print.

Shane Wallace, a police officer with Victoria Police Department, confirmed that State's Exhibit 17 was found on an upstairs windowsill between apartments C-2 and D-2. Officer Wallace also recalled seeing beer cans in Lott's apartment; cans that looked like the same brand as the one found upstairs.

Patrick Aitchison, a patrol lieutenant for the Victoria Police Department who assisted with the investigation, identified State's Exhibit 18 as a close-up photograph of the door to apartment C-2 with a blood spot, marked as Swab H. He confirmed that the DNA report regarding the blood stain, Swab H, "showed unknown male blood, upstairs,

6

apartment C-2."[8]   Lieutenant Aitchison collected, among other things, the following items:  (1) pay stubs and three beer cans from Lott's apartment; and (2) one beer can from the upstairs windowsill.   On cross-examination, when asked if fingerprints on Exhibit 17 could make someone a suspect, Lieutenant Aitchison responded that it depended on what the investigator put together; "through the forensic examination and investigation, they build that list of suspects."

Jason Turner, a police officer for Victoria Police Department, assisted with the investigation of the crime scene.   He testified that he was not aware of any physical evidence that placed anyone other than Hughes and Lott in the apartment where Lott died.   He testified that Harvey, who became a suspect early in the investigation, consistently denied any involvement in the crime.

Tom Copeland, a lieutenant of investigations for the Victoria County Sheriff's Office, testified regarding a recorded inmate's telephone call made from Harvey's cell block on February 19, 2009.   Lieutenant Copeland monitored the call and recognized Harvey's voice.[9]   An edited CD recording of the phone conversation, State's Exhibit 96, was played for the jury.   During the conversation, in response to the unidentified man's comment to Harvey that "in the paper it got he hit her 30 times.  Killed her," Harvey responded, "That ain't how it went down."   When asked, "You don't know what he's talking about; do you?", Lieutenant Copeland provided the following testimony:

> I can imagine what he's talking about.  Just by common sense, if you listen to the call, [the other man] refers to Melba being hit 30 times.

---

[8] The DNA Report excluded Harvey as a contributor to the blood stain from Swab H.

[9] The man Harvey called was not identified.

[Harvey] said, "That ain't how it went down."  If he had said, "I don't know how it went down"—but with him saying, "That ain't how it went down," that tells me he knew about it.

While agreeing that he was not positive about what Harvey was talking about, Lieutenant Copeland testified that he felt "pretty sure about it."

## B.  Defense Evidence

The defense called Hughes to testify.  Although he had been found guilty of capital murder in a separate trial eight months earlier, Hughes did not concede that he committed Lott's murder; rather, he admitted punching Lott over thirty times—"mutual combat."  Hughes described it as a fight on the day after Valentine's Day, a fight about who would smoke the last of the crack cocaine.[10]  According to Hughes, when he would not give the cocaine to Lott, she became upset and angry and retrieved an eighteen-inch butcher knife from the kitchen.  Hughes grabbed the knife, cut his hand, and "went to fighting from there."  Hughes testified that he was "mad," "real angry" when he left the apartment that afternoon.  According to Hughes, he left Lott on the floor, unable to get up.  She was "hurt pretty bad," but "she was responding.  She was cussing [him] out."  Hughes also stated that when he gave his videotaped statement regarding the incident, he told the investigating officers that no one else was present.

---

[10] The fourteen-year-old daughter of an assistant manager at Crossroads Apartments testified for the State.  She lived near the apartment complex and on or about March 4, 2006, at approximately 11:30 p.m. or 12:00 a.m., heard "a lot of arguing" coming from Lott's apartment.  The girl testified that she heard male and female voices but did not know whether there were multiple male voices or a single male voice. She also saw a tall man walk out of the apartment complex that night.  He was alone.

This testimony regarding an occurrence in March appears to be inconsistent with Hughes's testimony that the fight occurred in February.  However, the jury is the ultimate judge of credibility and weight to be given to testimony, and it was free to credit Hughes's testimony in ascertaining the time frame for the relevant events in this case.  *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979).

Hughes testified that after the fight, he "sat" in a "bayou"—"deep down in the ground, like a bridge," "here in Victoria" for a week and then, a week later, left for Houston. Hughes stated that neither he nor Lott filed a tax return for that year. Hughes also denied knowing Harvey, Archangel, Erica, Holt, or Walters. When the potentially negative ramifications of testifying were mentioned, Hughes told the jury that "the innocence of that man [Harvey] means more to me than myself and what I am going through," "it's really upsetting to me that he's been convicted, in the wrong," and "that man is an innocent man. I'm the guilty man here."

## II. STANDARD OF REVIEW

In reviewing the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard requires reviewing courts to resolve any evidentiary inconsistencies in favor of the judgment, keeping in mind that the fact finder is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given their testimony. *Id.* at 899. *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979) ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony . . . ."); *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010) ("Faced with a record of historical facts that support conflicting inferences, the reviewing court must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.") (Internal quotations omitted.)).

9

Appellate courts do not re-evaluate the weight and credibility of the evidence; they only ensure that the jury reached a rational decision. *Laster v. State*, 265 S.W.3d 512, 517 (Tex. Crim. App. 2009).

Legal sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *see Malik*, 953 S.W.2d at 240.

### III. APPLICABLE LAW

A person is guilty of aggravated assault if he intentionally, knowingly, or recklessly causes serious bodily injury to another or uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a). A person is guilty as a party to an offense "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both." *Id.* § 7.01(a) (West 2003). A person "is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2). Here, a hypothetically correct jury charge would state that Hughes was guilty of aggravated assault, a lesser-included offense of murder, if he intentionally, knowingly, or recklessly caused serious bodily injury to Lott or used or

exhibited a deadly weapon during the assault and that Harvey was criminally responsible for the aggravated assault committed by Hughes if, while acting with intent to promote or assist the commission of the offense, Harvey solicited, encouraged, directed, aided, or attempted to aid Hughes in committing the offense.

The identity of a perpetrator in an assault case may be proven by either direct or circumstantial evidence. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (en banc). "Circumstantial evidence alone may be used to prove that a person is a party to an offense." *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006); *Escobar v. State*, 28 S.W.3d 767, 774 (Tex. App.—Corpus Christi 2000, pet. ref'd). Moreover,

> [e]vidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement. In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.

*Ransom v. State*, 920 S.W.2d 288, 302 (Tex. Crim. App. 1996) (en banc) (op. on reh'g) (internal citations and quotations omitted); *cf. Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985) (en banc) ("[M]ere presence of a person at the scene of the crime, either before, during, or after the commission of the offense, or even flight from the scene, without more, is insufficient to sustain a conviction of one as a party to the offense."), *superseded by statute on other grounds as stated in Cook v. State*, 902 S.W.2d 471, 476 (Tex. Crim. App. 1995) (en banc).

A fact finder may support its verdict with reasonable inferences drawn from the evidence. *Laster*, 275 S.W.3d at 523; *Hooper*, 214 S.W.3d at 14; *see Roberson v. State*,

11

16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd) ("[I]dentity may be proven by inferences."); *Jones v. State*, 900 S.W.2d 392, 399 (Tex. App.—San Antonio 1995, writ ref'd) (explaining that the jury may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence). It is up to the fact finder to decide which inference is most reasonable. *Laster*, 275 S.W.3d at 523; *Hooper*, 214 S.W.3d at 14.

## IV. DISCUSSION

By his sole issue, Harvey contends that the evidence adduced at trial was not sufficient to support his conviction for the aggravated assault of Melba Lott. Specifically, Harvey challenges his status as a party to the offense.

Harvey contends that the State was unable to provide a single piece of physical evidence that linked him to the crime. This contention is supported by Officer Turner, who testified that he was not aware of any physical evidence that placed anyone other than Hughes and Lott in Lott's apartment and by forensic scientist Castro, who explained that Harvey was excluded from all blood stains examined and all DNA items reviewed from inside Lott's apartment. However, there is ample circumstantial evidence from which the jury could have inferred that Harvey participated as a party to the offense because the evidence places Harvey at the scene of the offense and shows his encouragement of and assistance with the offense. *See Ransom*, 920 S.W.2d at 3302; *see also* TEX. PENAL CODE ANN. § 7.02(A)(2).

Here, Archangel and Erica testified that when Harvey learned that Lott's body had

12

been found, he reacted to the news by asking if details were known or whether Lott was robbed. Harvey appeared nervous. The next day, Harvey was seen with Hughes. Harvey also told Archangel the following: (1) that he smoked crack cocaine with Lott the night she died; (2) that he told Hughes not to let Lott escape or get away; (3) that he was present when Hughes murdered Lott; and (4) that he or Hughes changed clothes upstairs in Harvey's apartment that night. According to Archangel, Harvey believed Lott was to receive an income tax refund, and she specifically remembered Harvey telling her "that he told [Hughes] that if [Lott] didn't give him the money, to kill the bitch." Harvey also knew that Hughes was on the south side of Houston and, sometime after the offense, asked Archangel to go to Houston with him. On one occasion while arguing, Harvey warned Archangel "not to make him do what Bruce did to [Lott]." In addition, after Lott's body was found, Harvey spent time with Archangel, and a rational juror could have determined that Harvey had the time and opportunity to tell Archangel about the offense.

Harvey also told Holt things about the murder scene and Walters's role in the offense, including that there was a blood trail leading from downstairs up to his apartment, that there was blood all over, that it might have been done by somebody who was very strong because blood was higher up on the walls, and that all Walters had to do was get rid of the knife. Holt also testified that Walters told her that Harvey told Walters to get rid of the knife. Based on this information, Holt believed Harvey had seen Lott's murder even though he told her he did not know the person who committed it.

In addition to the above testimony, the jury could have considered (1) that Harvey's print was on a plastic bag wrapped around a 24-ounce aluminum beer can found on an

13

upstairs windowsill in the apartment complex where Lott's body was found, and (2) that the windowsill was right outside apartment C-2 where Harvey lived. Lott lived downstairs in apartment A-2 where the investigative officers found beer cans of the same brand found outside Harvey's upstairs apartment.

The jury could also have considered the recorded telephone call where Harvey responded, "That ain't how it went down", when told that the newspaper reported "he hit her 30 times. Killed her." The jury could have believed Lieutenant Copeland's testimony that this statement suggested that Harvey knew about what happened. The jury could then have inferred that Harvey knew about what happened because he was there.

Harvey also contends that the evidence does not support his conviction because Hughes, who admitted to the assault by his own testimony in this case, unequivocally exonerated Harvey by stating that Harvey was not present and played no part in Lott's death. However, the jury is the ultimate judge of credibility and weight to be given to testimony, and it was free to credit testimony regarding the detailed information Harvey provided and the comments he made to others regarding what happened that night, while discrediting Hughes's testimony that no one else was present when he fought with Lott. *See Brooks*, 323 S.W.3d at 899; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04. We will not disturb that determination on appeal. *See Padilla*, 326 S.W.3d at 200; *Brooks*, 323 S.W.3d at 899. A rational juror could also have disbelieved Hughes when he testified that he did not know Harvey and believed Archangel who testified that she saw Hughes in the company of Harvey shortly after the offense was committed and that Harvey

14

discussed Hughes's involvement in the offense. Moreover, believing Archangel and not Hughes, a rational juror could have inferred that Harvey thought Lott was going to receive money from her tax refund or perhaps from a pay check, as testified to by Lott's brother, and told Hughes to kill Lott if she did not give him the money, thereby encouraging the events that took place at Lott's apartment. *See Massey v. State*, 826 S.W.2d 655, 658 (Tex. App.—Waco 1992, no pet.) (citing *Rodriguez v. State*, 486 S.W.2d 355, 358 (Tex. Crim. App. 1972)).

Such a juror could also have determined that Harvey assisted or aided in the offense when he told Walters that all she had to do was get rid of the knife. *See Ransom*, 920 S.W.2d at 302. And a rational juror could have determined that Harvey's plans to leave Victoria and move to Houston with Archangel were indicative of a guilty conscience. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (recognizing that "a fact finder may draw an inference of guilt from the circumstance of flight"); *Hardesty v. State*, 656 S.W.2d 73, 78 (Tex. Crim. App. 1983) (en banc) ("Flight is also a circumstance indicating guilt.").

Although it is true that the testimonies of Archangel, Erica, Holt, and Hughes posed potential issues of credibility, the jury, being the sole judge of the credibility of the witnesses, was free to accept or reject the evidence before it, and in doing so, concluded that Harvey was a party to the aggravated assault. *See Brooks*, 323 S.W.3d at 899; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04. We will not re-evaluate the weight and credibility of this evidence; we will only ensure that the jury reached a rational decision. *See Laster*, 275 S.W.3d at 517.

15

Finally, Harvey specifically challenges what he claims is the only evidence which arguably connects him to the crime—his statement to Archangel that he told Hughes he should kill Lott if she did not give him the money. Harvey reasons that because the jury expressly found him not guilty of capital murder or murder, it logically did not believe that he told Hughes to "kill the bitch."

However, even if the jury did not consider Archangel's testimony that Harvey told Hughes to kill Lott, a rational jury could still have found there was sufficient evidence to support Harvey's conviction as a party to Hughes's aggravated assault of Lott. *See Brooks*, 323 S.W.3d at 895; *Laster*, 265 S.W.3d at 517. The jury could rationally have inferred the following from the remaining evidence presented at trial: (1) Harvey had a motive for encouraging the aggravated assault because he thought Lott had money; (2) Harvey was at Lott's apartment when Lott was assaulted; (3) Walters was also at Lott's apartment when Lott was assaulted; (4) Harvey assisted in the aggravated assault when he told Walters all she had to do was get rid of the knife; (5) the knife Walters was to get rid of was the same knife used in the assault; (6) Harvey went to his apartment after the assault to change clothes; and (7) on his way to his apartment, Harvey left the can and bag on the window sill just outside his apartment door. Also, after Lott's body was discovered, Harvey appeared nervous. He was seen with Hughes immediately thereafter, and he asked Archangel to go to Houston with him, where Hughes was living. From the foregoing circumstantial evidence, even without considering Harvey's statement to Archangel about killing Lott, the jury could have rationally determined Harvey was present and encouraged and aided in Hughes's aggravated assault of Lott. *See* TEX.

16

PENAL CODE ANN. § 7.02(a)(2).

Because the circumstantial evidence, viewed in the light most favorable to the verdict, supports a finding that Harvey was guilty of aggravated assault under the law of parties, we conclude that the evidence was sufficient to support Harvey's conviction. We overrule the sole issue.

## V. CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 17th
day of November, 2011.