

# NUMBER 13-14-00530-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**ROBERTO CARDENAS GARZA,**                                                  **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                          **Appellee.**

---

### On appeal from the 206th District Court
### of Hidalgo County, Texas.

---

# MEMORANDUM OPINION

**Before Justices Garza, Benavides and Longoria**
**Memorandum Opinion by Justice Garza**

Appellant, Roberto Cardenas Garza was convicted of capital murder, *see* TEX. PENAL CODE ANN. § 19.03(a)(2) (West, Westlaw through 2015 R.S.), and was sentenced to life imprisonment. By two issues on appeal, appellant argues: (1) the trial court erred in denying his pre-trial motion to suppress written statements he made to police; and (2)

the evidence adduced at trial was insufficient to support the conviction. We affirm.

## I. BACKGROUND

A deceased and decomposing human body was discovered on August 17, 2011, in an isolated rural area south of McCook in Hidalgo County. The decedent had been a victim of a gunshot wound to the back of the neck. Investigators arrived and found, in close proximity to the body, three white plastic "zip ties" that had been cut. Police also recovered shotgun casings and a spent bullet found near and underneath the body.

While at the scene, police were advised by dispatch of a report of a missing person with tattoos that matched those of the decedent. Investigator Laura Gonzalez made contact with Mayra Ibarra, the person who made the missing person report, and was able to identify the deceased as Ibarra's husband, David Alejandro Martinez. According to Ibarra, the last time she saw her husband was when their neighbor, Jose Francisco Rodriguez, left with him from Rodriguez's property.

Officers also made contact with Rodriguez, who reported that he had seen Martinez the previous day. Rodriguez testified at trial that Martinez was involved with smuggling people and drugs, and with stealing drugs. Rodriguez stated that, on the day he last saw Martinez, a man named David driving a green Chevrolet Malibu came by his property looking for Martinez. Rodriguez left with David to a mechanic shop located on Moorefield Road. When he arrived, two men ordered Rodriguez to undress and threatened him with a gun. The men asked Rodriguez if he was "Paco"; he said no. The men then asked Rodriguez if he knew Martinez or "Paco," and they asked where they could find Martinez. They asked "something about [Martinez], something about 'mota' or marijuana." The men told Rodriguez that if he did not bring Martinez to them, "they would

2

harm my family." Rodriguez could not say whether either of the men who threatened him were located in the courtroom at trial. Rodriguez decided to get Martinez and bring him to the Moorefield Road shop. In order to lure Martinez to come with him, Rodriguez falsely told him that he "had a person that had illegals that he could take up north." Rodriguez dropped Martinez off at the Moorefield Road shop and left. He observed men "push[ing]" Martinez into the shop as he left. Rodriguez later was able to pick out appellant and David Cedillo as the two men who threatened him in photo lineups presented by police.

Oscar Gonzalez, a sheriff's office crime scene specialist, was asked to process three vehicles that had been impounded, including a Ford pickup truck that was observed departing appellant's home and which was being driven by Tomas Ricardo Garza, appellant's brother. The truck contained a .380 Auto caliber pistol and matching ammunition. Gonzalez also processed a green Chevrolet Malibu which was being driven by Cedillo. The trunk of the green Malibu was empty except for a dirty pair of black boots in the middle of the trunk. Gonzalez stated that the zip ties found at the scene were tested for DNA, but did not match the DNA of the decedent. None of the evidence collected from the vehicles was sent for DNA analysis. The pistol was determined not to be the murder weapon.

Police executed a search warrant on a residence on Moorefield Road in Mission. There was a main house and a guest house on the property. There were clothes and a television in a bedroom on the second floor of the guest house. Empty gun holsters and a cardboard box for a gun were found in the main house. Appellant's passport was also found in the main house. Appellant arrived at the residence while the search was ongoing and later agreed to go to the sheriff's office for questioning.

3

Police executed another search warrant on a suspect's residence on Tulipan Street in Mission. An auto insurance identification card bearing the names of appellant and his wife were recovered. Police also found a "clear plastic baggy with a green, leafy substance" as well as two lighters from the residence.

Over the course of two days, Hidalgo County Sheriff's Office investigators took three separate written statements from appellant. The first statement, which states that it was taken from 1:00 p.m. to 2:11 p.m. on August 19, 2011, reads as follows:

> I would like to state that I am currently living at my daughter's home in Mission, TX. I used to live at 9374 N. Moorefield Road, which is on about 8 mile line, in rural Mission, TX. I have not lived at 9374 N. Moorefield Rd for about the last month and a half. My wife and I decided to move out because we could not pay the mortgage anymore. My wife and I are currently selling the home on Moorefield Rd.
>
> I would like to state that I have been asked numerous questions about a homicide investigation that the Hidalgo County Sheriff's Office is currently conducting. I would like to state that I was asked about Monday the 15th of 2011. I was asked to recall my whereabouts and who I interacted with on that day.
>
> I recall that I opened up the shop that day, but I do not remember at what time. Once I opened the shop I started to move the vehicles that are for sale out and near the roadway. I would like to state that about 10 minutes later "Miagi" got to the shop. I told "Miagi" that there was no work to be done and that if he had an[y] errands to run he could go handle that and come back later. "Miagi," who is the painter at the shop, told me that he had some hooks to go buy some clamps for molding on a vehicle that he was finishing a paint job on. "Miagi" left.
>
> About 10 minutes after "Miagi" left, David [Cedillo] got there. David is my cousin and he lives at the property that I recently vacated, which is next door to the shop. David runs a car lot out of my shop. I stayed there with David for 15 to 20 minutes. I then left. I went to go buy feed for the animals at my ranch. I bought the feed at 2 mile line, between Los Ebanos and Trosper. The store is South West Hay & Feed.
>
> After I left the feed store I went to pick up my daughters from school. My daughters get out of school at 11:30am. I arrived late to pick them up. At around noon I received a call from my daughter's school to see if I was going to pick them up. About 5 minutes later I got to the school and picked

4

them up. I took my daughters home. I took a short nap there at the house.

David called me and told me he needed to take the King Ranch truck to see how much they would give them for a trade in. I drove towards the shop. I dropped my girls off at the day care center near the truck. I then picked up David and we went to Spikes Ford. We got the quote David needed and we went back to the shop. I left David there, went and picked up my daughters, and went home.

Later that night, around 9:00pm–9:30pm I drove to the shop to put the vehicles that are for sale back in their places. I returned home after doing so.

I would like to state that I have no other knowledge, or any information that may lead to the suspects in this case.

The second statement, which states that it was taken from 1:49 a.m. to 3:34 a.m. on

August 20, 2011, reads as follows:

I want to say I already gave a statement to the investigators and I would like to add to the statement.

I know a man that is from Camargo, Mexico. I only know the man as Pepe or El Negro. I have known him for around 3 years. Pepe is in the smuggling business and moves illegal aliens and drugs. I have worked for Pepe in the past.

Pepe is around 35 or 38 years old, 5'5", 220 lbs. short black hair and dark skin. He has a tattoo of the Santa Muerte on his left forearm. He drives a white 4 door F-150 [] ranch style truck with a white brush guard and white head rack and tool box. The truck has green Mexico License Plates.

One month ago Pepe came by my house and said he was looking for a stash house. He asked if he could rent my guest house. I told him no because my house was already burned. I told him about a ranch that was for rent on 6½ Mile and Trosper Road. He went and looked at it and [said] he didn't like it. I then told him my uncle Lupe Garza had a house for rent. Lupe's house is on the comer of 2 Mile Line and Goodwin Road. Pepe rented the house and took one of my workers named Abel to take care of it.

I had not heard [from] Pepe until this past Friday. Pepe called me and said he needed to talk to me. He was mad because someone had stolen some of his marihuana. I told him to meet up with me at the shop on Moorefield Road.

I met up with him that same Friday at around 2:00 or 3:00 P.M. Pepe told me Abel had stolen his marihuana and accused me of [stealing] it too. I told

5

him I had nothing to do with stealing his drugs. He told me I needed to find Abel for him. I told him I would look for Abel and call him when I found him. Pepe left and I drove by a mechanic shop that is by 1½ Mile Line and Abram Road. I asked a skinny guy at the mechanic shop if he knew a man named Paco. He said the owner of the sho[p] was named Paco and I drove off.

The reason I drove to the mechanic shop was because I remember Abel telling me that a man named Paco and [Martinez] had crossed him from Mexico. Abel once showed me the house Paco lived in and it was a blue mobile home on the same street as the mechanic. He took me by the house because Paco had stolen $1000.00 from Abel and he wanted me to talk to Paco and get his money back.

After I drove by the mechanic shop I went and my family and I drove to Port Mansfield. We stayed in a rented cabin and then drove home on Sunday.

On Sunday, at around 8:00 P.M., I called Pepe and told him about Paco and [Martinez]. Pepe came by in his white truck and picked me up. I showed him where the mechanic lived and he took me back to the shop. When we got back to the shop he told me to bring Abel to him or he was going to take me to Mexico. Pepe then left and I went home.

This past Monday, at around 9:00 A.M., I arrived at my used car dealer shop and paint and body shop. The shop is located at 8 Mile Line and Moorefield Road. I opened the shop and the paint man named Miagi got there with his wife. I told Miagi to leave and that I would call him when he could come back. I told him to leave because I was going to take care of this business with Abel. David got there in his blue Malibu. I asked David about the mechanic named Paco that lived in the trailer house by Abram Road. David said he knew Paco and that he had the man's phone number. David called him and asked him to come over to the shop. Before the mechanic got to the shop, Pepe pulled up in his white truck. I told him the mechanic was on his way [] over.

The mechanic then got to the shop in a small white two door truck. David and the mechanic walked into the shop office and P[e]pe told me to check both of them for guns. Pepe had pulled out a gun and was pointing them at the mechanic. I asked the mechanic about Abel and he said he did not know about any Abel. I asked if he was the same Paco that crossed Abel into the U.S. The mechanic said he was not Paco and that Paco lived in the blue trailer down the street from his mechanic shop. The mechanic said Paco and Paco's brother in law [Martinez] were the ones that crossed people illegally. Pepe was telling him he wanted the marihuana they had stolen from him. He said he was not going to die for something he did not do and he would bring Paco or the brother in law to us.

The mechanic left in the small white truck and came back around 10:30

6

A.M. with a man. I had never seen this man before. The man was around 30 or 35 years old. He had long black hair and was wearing [] shorts and sandals. I do not remember the shirt he was wearing. The mechanic just dropped the man off and left. The man walked into the office and David me and Pepe were inside. As soon as the man walked in, Pepe punched the man on the right side of the head behind the ear. The man fell to the floor next to the sofa and Pepe pulled out his gun. Pepe pointed it at him. The gun was a black gun that you pull the slide back to load. Pepe stood over the man who was cowering on the floor saying what did I do what did I do. Pepe told me to tie him up and handed me some white plastic ties. I tied the man's hands in the front and Pepe put the gun down on the table and started beating him with his fist. He was punching the man around the head and accusing him of stealing his marihuana. Pepe asked the man if he was Paco and the man said he was [Martinez] and his brother in law was Paco. [Martinez] told Pepe a man named Chuey had sent him to steal the marihuana. [Martinez] said he Paco, Abel and another man stole the marihuana and put it at his house. [Martinez] said Chuey then took the marihuana and had not paid him anything. David was in the room with us while everything was happening but did not do anything. [Martinez] told Pepe he would show him where Chuey lived.

Pepe then grabbed [Martinez] and told him he was taking him to Mexico. [Martinez] told him to talk to his "[j]efe" in Dia[z] Orda[z], Mexico. I do not know if he me[a]nt his father [or] his boss. Pepe then put [Martinez] in his white truck and took him.

Finally, the third statement, which states that it was taken from 1:49 a.m. to 5:52 a.m. on

August 20, 2011, reads as follows:

I would like to add to my first statement that Pepe told me for us to go to Mexico with [h]im. I told him I was not going to go. He said that we were just to go talk with [Martinez]. At about 4:00pm or 5:00pm, Pepe walked [Martinez] out of the shop and we got into the truck. Pepe was driving, [Martinez] was lying down on the back seat, and I was on the passenger side front seat. [Martinez] took us to 1½ north Abram Rd. to a subdivision on the west side to a blue mobile home and told us that was where Paco lived. We then drove north on Abram Rd. to 3 Mile line then turned east and then north on Moorefield Rd. We then drove towards M[c]Cook, Texas and turned west on 14 Mile line. We then turned south on Abram Rd. and drove south about 3 to 4 miles. We then drove east on a dirt road and reversed into a dirt road that lead into a grassy field. I then realized that Pepe was going to kill [Martinez]. Pepe got of the driver side of the truck and walked towards the back of the truck. I got off the passenger side of the truck and I then got [Martinez] out of the back passenger side of the truck. [Martinez] walked to the back of the truck. Pepe cut off one of the plastic ties.

7

Pepe walked him about 100 yards and then he cut off the rest of the plastic ties. Pepe then made him take off his clothes and he kneeled him [Martinez] down facing west. Pepe then shot [Martinez] once in the back of the head with the gun that he had. Pepe then walked back to the truck and threw [Martinez]'s clothes in the back seat. We then drove to La Carretas Drive Thru at Doffing Rd. and 7 mile line. Pepe drove through the drive thru store towards the back where Pepe threw the clothes in the dumpster. We then drove to my shop and Pepe left. He took the gun with him. Pepe told me while we drove back to the shop after he shot [Martinez] for me not to say anything and for me to continue looking for the rest of the guys.

Police efforts to identify and locate "Pepe" were unsuccessful.

Appellant was convicted of capital murder and, because the State did not seek the death penalty, appellant was sentenced to life imprisonment. *See id.* § 12.31(a)(2) (West, Westlaw through 2015 R.S.). This appeal followed.

## II. DISCUSSION

### A. Sufficiency of the Evidence

We first address appellant's second issue regarding sufficiency of the evidence to support conviction. *See, e.g., Lucas v. State*, 245 S.W.3d 611, 612 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (noting that issues calling for rendition of judgment should be considered before issues calling for remand); *see also* TEX. R. APP. P. 43.3.

#### 1. Standard of Review and Applicable Law

In reviewing the sufficiency of evidence supporting a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Hacker v. State*, 389 S.W.3d 860, 865 (Tex. Crim. App. 2013); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences

8

from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). When the record of historical facts supports conflicting inferences, we must presume that the trier of fact resolved any such conflicts in favor of the prosecution, and we must defer to that resolution. *Padilla v. State*, 326 S.W.3d 195, 200 (Tex. Crim. App. 2010).

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* Here, a hypothetically correct jury charge that is consistent with the indictment would instruct the jury to find appellant guilty of capital murder if he: (1) intentionally caused Martinez's death; and (2) was then and there in the course of committing or attempting to commit kidnapping. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). A person commits kidnapping if he intentionally or knowingly abducts another person. *Id.* § 20.03(a) (West, Westlaw through 2015 R.S.). "Abduct" means "to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2) (West, Westlaw through 2015 R.S.).

A person acts intentionally with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (West, Westlaw through 2015 R.S.). A person acts knowingly with respect to the nature of his conduct or to circumstances surrounding his

9

conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* § 6.03(b). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.*

A hypothetically correct jury charge in this case would permit the jury to convict appellant either as a principal or as a party to the offense. Under the law of parties, "[a] person is criminally responsible for an offense committed by the conduct of another if, . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2) (West, Westlaw through 2015 R.S.). Further:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* § 7.02(b).

Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement. *Salinas v. State*, 163 S.W.3d 734, 739–40 (Tex. Crim. App. 2005). Party participation may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act. *Id.* at 740.

### 2. Analysis

Rodriguez testified that he identified appellant as one of the two men who threatened him with a gun and demanded that he bring Martinez to them or they would

harm his family.[1] Rodriguez stated that he complied with the demand and delivered Martinez to the two men. Martinez was not seen alive again.

Moreover, although appellant challenges the admissibility of his written statements, we must consider all evidence actually before the jury in our sufficiency analysis. *See Moff v. State*, 131 S.W.3d 485, 489 (Tex. Crim. App. 2004). In his statements, appellant told police that he tied up Martinez's hands using "white plastic ties" while "Pepe" beat Martinez. White plastic zip ties were found, already cut, near Martinez's dead body. Appellant stated that he was in the passenger seat of the truck, and Martinez was lying down in the back seat bound by the zip ties, while "Pepe" drove on a dirt road for several miles to a remote "grassy field." According to appellant's statement, after he realized "Pepe" was going to kill Martinez, appellant took Martinez out of the truck and observed as "Pepe" shot and killed Martinez.

Police could not locate or confirm the existence of "Pepe"; but even if the jury believed that "Pepe" actually existed and orchestrated the crime, as appellant asserted in his statement, the jury could still have found appellant guilty under the law of parties in light of appellant's statements. In particular, a rational juror could have reasonably concluded that, by binding Martinez in zip ties and taking Martinez out of the truck after realizing "Pepe" was going to kill Martinez, appellant intentionally aided "Pepe" in kidnapping and killing Martinez. *See* TEX. PENAL CODE ANN. § 7.02(a)(2).

Appellant argues principally that there was no evidence that he had the "conscious objective or desire" to kill Martinez. *See id.* § 6.03(a). But intent may generally be inferred

---

[1] Rodriguez refused to identify appellant in the courtroom at trial, but the evidence established that he had previously identified appellant in a photo lineup presented by police.

11

from circumstantial evidence such as acts, words, and the conduct of the appellant. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004). Here, such evidence included Rodriguez's photo lineup identification of appellant as one of the men who demanded, at gunpoint, that Rodriguez bring Martinez to them; as well as appellant's statements that he bound Martinez with zip ties and took Martinez out of the truck after realizing that "Pepe" was going to kill Martinez. The jury could have inferred from this evidence that appellant harbored the specific intent to kidnap and kill Martinez. Even if it did not believe that appellant had the specific intent to kill Martinez, a rational juror could have reasonably concluded that appellant and "Pepe" attempted to carry out a conspiracy to kidnap Martinez; that "Pepe" killed Martinez in furtherance of the kidnapping; and that the murder should have been anticipated as a result of the carrying out of the conspiracy. *See* TEX. PENAL CODE ANN. § 7.02(b).

The jury is the sole judge of the credibility of witnesses and the weight to be given the testimony, and it may choose to believe some testimony and disbelieve other testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). We may not act as a "thirteenth juror" by substituting our judgment for that of the jury. *See Brooks*, 323 S.W.3d at 905. We conclude that the evidence was sufficient to allow a rational juror to find appellant guilty of capital murder as a principal, as a party, or as a co-conspirator. *See* TEX. PENAL CODE ANN. § 7.02(a)(2), (b). We overrule appellant's second issue.

## B. Motion to Suppress

By his first issue, appellant argues that the trial court erred by denying his motion to suppress the three written custodial statements on grounds that his Fifth Amendment

right to counsel was violated. *See* U.S. CONST. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself.").

### 1. Standard of Review and Applicable Law

In reviewing claims concerning the admission of statements made as the result of custodial interrogation, we conduct a bifurcated review as articulated in *Guzman v. State*. *See Pecina v. State*, 361 S.W.3d 68, 78–79 (Tex. Crim. App. 2012) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We afford almost total deference to the trial court's rulings on questions of fact and on questions involving the application of law to fact that turn upon a witness's credibility and demeanor. *Id.* at 79. We review de novo the trial court's rulings on questions involving the application of law to facts that do not turn upon a witness's credibility and demeanor. *Id.*

### 2. Suppression Hearing

Three Hidalgo County Sheriff's Officers testified at the suppression hearing. Sergeant Herman Perez stated that he was a supporting investigator in the case and that he took a statement from appellant on August 19, 2011. Perez stated that he advised appellant of his constitutional rights to have an attorney present during questioning, to remain silent, to terminate the interview at any time, and against self-incrimination. According to Perez, appellant indicated that he understood each of the rights and that he would agree to waive those rights. Perez stated that appellant did not request an attorney at any point during the interview, nor did he ask to terminate the interview. Perez stated that appellant was not under the influence of drugs or alcohol during the interview, nor was he denied access to basic necessities such as restroom, food, or cigarettes. Perez denied coercing or threatening appellant into making the statement.

13

A *Miranda* rights warning form containing appellant's initials and signature was entered into evidence. On the form, which stated that it was taken at 11:15 a.m. on August 19, 2011, appellant indicated that he understood the rights and would like to waive them. Perez testified that, after typing appellant's statement, he gave appellant the opportunity to review the statement and to make changes, but appellant did not request any changes.

On cross-examination, Perez acknowledged that, although all five of the *Miranda* warnings were contained on the written statement, appellant's initials appeared only four times. Defense counsel posited that appellant declined to place his initials next to the statement that he has the right to have a lawyer present during questioning. Perez disagreed, stating that "I can't tell you which one he left out, sir." Perez acknowledged that he knew appellant had a disability but did not recall specifically what that disability was. Perez stated: "I'd be trying to guess if I were to tell you. It's something with his maybe kidneys maybe." Appellant did not complain that he was in pain or suffering because of the disability. Perez further acknowledged that the interview was not video-recorded. Perez denied promising appellant anything or telling him that his wife was being interrogated. He reiterated that appellant never asked for an attorney.

Sergeant Max Cantu testified that he was present during appellant's initial interview on August 19, 2011. Cantu stated that, although appellant had already been read his *Miranda* rights, Cantu read them to appellant as well. Cantu obtained a second written statement from appellant. According to Cantu, appellant never requested an attorney and was not coerced or threatened into making the statement. Cantu stated he never made any promises to appellant nor did he deprive appellant of necessities.

14

Appellant did not appear to be under the influence of drugs or alcohol. Cantu stated that he gave appellant the opportunity to review and change the statement, but that appellant did not request to make any changes. Again, Cantu conceded that appellant had signed his initials only four times even though the form contains five different *Miranda* warnings.

Cantu could not recall whether he spoke to attorney Eddie Medrano on August 19, 2011. Defense counsel asked Cantu whether he recalled that Medrano advised him that he is appellant's attorney and that he wanted to talk to appellant. Cantu replied: "I do not, but it wouldn't be relevant. He can't invoke the Defendant's right for him."

Sergeant Vic De Leon testified that he was the lead investigator on the case. He took the third written statement from appellant. According to De Leon, appellant never asked for an attorney or to terminate the interview. De Leon stated that he did not coerce or threaten appellant into making the statement, nor did he promise anything in exchange for the statement. Appellant did not appear to be under the influence of drugs or alcohol during the interview and was not denied any necessities. On cross-examination, De Leon denied that appellant told him he needed to take certain medications. On re-direct examination, De Leon stated that, hypothetically, De Leon would have been notified if an attorney claimed to represent appellant and wanted to speak to appellant. When asked whether he was so notified, he replied: "I don't recall that, no."

Each written statement contains the *Miranda* warnings and each is preceded by the following sentence: "And prior to and during the making of this statement, I knowingly, intelligently and voluntarily waive those rights set forth in this document and have knowingly, intelligently and voluntarily waived those rights, I do hereby make the following free and voluntary statement." Each statement contains appellant's signature next to the

15

following sentence: "I give this statement of my own free will, not promised anything in return, and not coerced into giving this statement."

Defense counsel called attorney Heriberto "Eddie" Medrano to the witness stand. Medrano testified that he received a phone call from appellant one day in 2011; at the time, Medrano was representing appellant on a pending state drug case. Medrano testified:

> [Appellant] called me and—and said that he had driven by his house on Moorefield Road, I believe, and said that—that he saw law enforcement out there, sheriff's deputy cars. And he asked me what I should do, what he should do. So I advised him to go ahead and—I thought it had to do with an issue concerning his bond on the pending drug case because I'd gotten him out on a very, very low bond and the State prosecutor had told me that he thought it was kind of low and was going to try to perhaps consider getting a higher bond. So I figured they were there to re-arrest him because he had been indicted or something and the district Judge can always ask for a higher bond. So I advised him, look, just go to the—go to your—go to the house, tell them who you are and then call me and tell me what it's all about.
>
> . . . .
>
> And [appellant] calls me back and he says that they're there to arrest him. And so I said, well, for what? He says I don't know. And so he says, here, and I could hear somebody like on the phone close to him, and he says, here, you can go ahead and talk to him. So I—an officer, I don't know—I don't know who the officer was because obviously I wasn't seeing him, and I identified myself and he said who's this? And I said, this is Eddie Medrano, I'm [appellant]'s attorney. What's going on? And then the officer says, well, we're here to go ahead and arrest [appellant]. And so I said, well—well, why? I mean, he's out on bond. And he basically said, well, I'm just doing my duty in taking him in. And then I—I had a conversation with the officer, I said, well, look, I'm his attorney, where are you taking him? Because I— just so you'll know, my thought was that perhaps the—the federal authorities had indicted him federally. And so I'm thinking, well, maybe they're going to be taking him to the federal courthouse later on for initial appearance. So I said, well, where are you taking him? And he says we're taking him to Hidalgo County. And so I thought in my mind, well, it's got to be the—the bond issue that the State wants to go ahead and raise his bond. So I said, well, okay, fine, you know, go ahead and take him in, but, you know, don't interrogate him, don't question him, I'm his attorney and I'll try to go ahead

16

and find out who the—who the Judge is that has the case and try to get a bond.

. . . .

And so then—then he passes [appellant] back to me. I said, look, they're going to take you in, don't resist, don't answer any questions, I'll see you this afternoon. If you're not out on bond, you don't call me, that means you're still incarcerated and when I come back from San Antonio early in the afternoon, I'll see you in the afternoon.

Medrano testified that he came back from San Antonio that afternoon at around 3:30 or 4:30 p.m. and went to the Hidalgo County Jail, but appellant was not there. Medrano then when to the Hidalgo County Sheriff's Office. He testified:

I go to the front window there and identify myself, my bar card, my drivers' license and I said, my name's Eddie Medrano, I'm an attorney, I'm looking for [appellant]. And so I need to talk to him. And so I think we waited 40, 45 minutes, finally a gentleman comes out and he identifies himself as Investigator Cantu. And so I tell him, well, Mr. Cantu, I'm Eddie Medrano, you know, I'm—I'm here to see [appellant]. And we have a conversation. . . . I told him, look, I'm his attorney, I have a right to go ahead and be with him during any interrogation. And he says, well, what are you representing him on? And I said, well, I'm representing him on this drug case. Because I'm thinking he's been re-arrested for this—this drug offense. And he said, well, we don't have him here for that. And I said, well, why is he here? He says, we're doing a homicide investigation. And so then I said, well, I'm still his attorney and I will need to go ahead and be with him. I need to see him. I need to talk to him. And he said, well, I've already told him that you're here and I'm—and I'm figuring, well, in the 45 minutes that I've been waiting, right? And—and he says he doesn't want to see you. And that didn't make any sense to me because obviously I talked to [appellant] earlier that same morning. So I said you—well, I want to hear him tell me that. And he says, well, no, because I've told—I says, you told him that I'm here? And he says, yes, sir. And he's telling you that he doesn't want to see me? That's right. I said, well, I want to hear him tell me that. Well, that's not going to happen, or words to that effect.

On cross-examination, Medrano testified that he represented appellant "concerning the pending drug case and other matters that were pending as well"; however, he conceded that he had not been paid to represent appellant concerning any homicide investigation. According to Medrano, appellant's wife called him later in the day but eventually hired

17

another attorney to represent appellant after Medrano advised her that "I can't represent him because I don't do homicide defense."

Appellant testified that he called Medrano on August 18, 2011 "to see what was going on there at the ranch." At some point, he gave his phone to Cantu and Cantu later gave the phone back to him. Appellant stated that he told investigators that he had kidney problems and needed to take medication twice a day, but did not take the medication during the course of his interrogation. He stated that he was taken to the bathroom once and did not eat. Regarding the written statements, appellant testified:

> When I signed those papers, it's because Mr. Max Cantu told me that if I—I didn't sign those papers, that they were going to arrest my wife and take my girls away. . . . He kept on ask—telling me, you know, just help yourself here, you don't need no attorney. I kept on telling him I needed to speak to my attorney and he kept on telling me you don't need an attorney, that I was not under arrest, for me just to tell him what had happened. . . . And as soon as I signed these papers, he told me that I was under arrest.

Appellant denied that Cantu ever told him that Medrano was at the sheriff's office and wanted to see him. Appellant stated that, because of his kidney condition, he was taken to the hospital after his arrest and stayed there for three or four days. He conceded on cross-examination that he had previously been convicted of a felony in federal court. He also conceded that his signature appeared on the various written statements.

### 3. Findings and Conclusions

The trial court denied appellant's motion to suppress and issued, among others, the following findings of fact:

> 5. Defendant was advised of his Miranda Rights by Investigator Herman Perez before being interviewed on August 19, 2011 and waived these rights.
>
> 6. Defendant was subsequently advised of his Miranda Rights and after waiving these rights was questioned by Investigator Max O. Cantu on August 20, 1011.

18

7. Defendant was again advised of his Miranda Rights before being questioned by Investigator Vic De Leon on August 20, 2011 and waived these rights.

8. Defendant understood his Miranda Rights and acknowledged this by initialing the Miranda Waiver.

9. Defendant knowingly, intelligently, and voluntarily waived these rights and agreed to answer the investigators' questions regarding a capital murder investigation.

10. Defendant did not withdraw his waiver while interviewed by law enforcement or cease any of the interviews.

11. Defendant did not invoke his right to counsel during any interview with law enforcement investigators.

12. Defendant was not deprived of any basic necessities such as food, bathroom breaks, or cigarettes while interviewed by law enforcement.

13. Defendant was not under the influence of any narcotics or alcohol at the time he provided his statements to law enforcement.

14. Defendant provided and signed three (3) separate typed out statements of accused to law enforcement.

15. Each statement of accused had the required Miranda Rights typed out on each separate page.

The trial court concluded that appellant's written statements did not violate articles 38.21 or 38.23 of the Texas Code of Criminal Procedure, the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution, or the Due Process of Law provisions of the Texas Constitution. *See* U.S. CONST. amends. V, XIV; TEX. CONST. art I, §§ 13, 19; TEX. CODE CRIM. PROC. ANN. art. 38.21, 38.23 (West, Westlaw through 2015 R.S.).

4.   Analysis

Appellant argues correctly that, once a defendant unambiguously requests to speak with his lawyer, police questioning must cease until counsel has been provided or

the defendant initiates further communication with the police.  *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).  But here, there was conflicting evidence as to whether appellant ever requested to speak with a lawyer.  Although appellant testified that he "kept on telling [Cantu] that [he] needed to speak to [his] attorney," each of the police officers testified that appellant never requested to speak to his attorney.  The trial court later specifically found that appellant "did not invoke his right to counsel during any interview with law enforcement investigators."  This finding is entitled to "almost total deference" from this Court because it was based on the credibility and demeanor of the witnesses at the suppression hearing.  *See Pecina*, 361 S.W.3d at 79.[2]  Because the finding is supported by the record, we may not disturb it.

The testimony of attorney Medrano does not alter this conclusion.  In *Janecka v. State*, the Texas Court of Criminal Appeals noted that, although "the Fifth Amendment right to counsel is a right that is personal to the accused," there are "certain circumstances" in which "an accused's attorney can speak for the accused in invoking Fifth Amendment protections."  739 S.W.2d 813, 828 (Tex. Crim. App. 1987).  Specifically,

> an attorney can speak for his client in invoking the Fifth Amendment right to counsel if:  (1) the attorney-client relationship exists; (2) the attorney invokes the Fifth Amendment right to counsel in the presence of the accused or after conferring with the accused; (3) the accused does nothing to contradict his attorney; and (4) officers agree not to question the accused in the attorney's absence.

---

[2] Appellant further testified at the suppression hearing that he signed the statements only because Cantu threatened "to arrest [his] wife and take [his] girls away."  However, he does not argue on appeal that his statements were involuntary because they were obtained via threats and coercion.  Even if he did make that argument, it would not be meritorious because (1) the officers each testified that they did not coerce or threaten appellant or make any promises to appellant in exchange for the statements, (2) the trial court expressly found that the statements were voluntarily made, and (3) that finding would be entitled to "almost total deference" because it was a mixed question of law and fact based on the witnesses' credibility and demeanor.  *See Pecina v. State*, 361 S.W.3d 68, 79 (Tex. Crim. App. 2012).

*Id.* Here, the evidence established that Medrano represented appellant on an unrelated drug case but did not, at the time he attempted to invoke the Fifth Amendment right to counsel on appellant's behalf, represent appellant with respect to the capital murder of Martinez.[3] Even if we assume that an "attorney-client relationship exist[ed]" for purposes of *Janecka*, there was no evidence establishing that any officer agreed not to question appellant without Medrano present. *See id.* Accordingly, the test elucidated in *Janecka* is not satisfied and Medrano was not entitled to invoke Fifth Amendment protections on appellant's behalf.

The fact that police never told appellant that Medrano was there and wanted to see him also does not change the result. In *Moran v. Burbine*, the United States Supreme Court considered "whether a prearraignment confession preceded by an otherwise valid waiver must be suppressed either because the police misinformed an inquiring attorney about their plans concerning the suspect or because they failed to inform the suspect of the attorney's efforts to reach him." 475 U.S. 412, 420 (1986). In an opinion by Justice O'Connor, a majority of the Court found that the failure of police to advise the defendant of a telephone call from his attorney had "[no] bearing on the validity" of the defendant's *Miranda* rights waivers. *Id*. at 423. The Court observed:

> Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. . . . [W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.
>
> . . . .

---

[3] In fact, Medrano later declined to represent appellant on the murder charge, telling appellant's wife that "I don't do homicide defense."

> Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident. *Compare Escobedo v. Illinois*, 378 U.S. 478, 481 (1964) (excluding confession where police incorrectly told the suspect that his lawyer "'didn't want to see' him"). Nor was the failure to inform respondent of the telephone call the kind of "trick[ery]" that can vitiate the validity of a waiver. *Miranda*, 384 U.S. at 476. Granting that the "deliberate or reckless" withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.

*Moran*, 475 U.S. at 422–24. The Court found that, because the defendant's "voluntary decision to speak was made with full awareness and comprehension of all the information *Miranda* requires the police to convey," the waivers were valid. *Id.* at 424. The Court declined to "adopt a rule requiring that the police inform a suspect of an attorney's efforts to reach him." *Id.* at 425; *see id.* at 427 ("[A] rule requiring the police to inform the suspect of an attorney's efforts to contact him would contribute to the protection of the Fifth Amendment privilege only incidentally, if at all. This minimal benefit, however, would come at a substantial cost to society's legitimate and substantial interest in securing admissions of guilt.").

We believe that *Moran* is analogous to the case at bar. As in *Moran*, there is no dispute here that appellant was fully advised of his *Miranda* rights prior to making each of the statements at issue. Even assuming that Medrano represented appellant with respect to the Martinez murder investigation, the police were under no legal obligation to inform appellant that Medrano was there and wanted to speak with him. *See id.* The undisputed fact that police did not inform appellant of Medrano's presence, though arguably unethical, *see id.*, did not invalidate appellant's otherwise-effective waiver of his *Miranda* rights.

22

For the foregoing reasons, we conclude that the trial court did not err in denying appellant's motion to suppress. We overrule appellant's first issue.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
19th day of November, 2015.