**Opinion filed February 15, 2024**



In The

# Eleventh Court of Appeals

_____

## No. 11-22-00318-CR

_____

## LUIS HERNANDEZ, JR., Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 118th District Court**
**Howard County, Texas**
**Trial Court Cause No. 16195**

## M E M O R A N D U M   O P I N I O N

A grand jury indicted Appellant, Luis Hernandez, Jr., for the murder of his ex-girlfriend, Maria Soto. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West Supp. 2023). Appellant entered a plea of not guilty and, after a jury trial, he was convicted of the charged offense. Upon Appellant's election, the trial court assessed Appellant's punishment at life imprisonment in the Texas Department of Criminal Justice, Institutional Division, and sentenced Appellant accordingly. In a single

issue, Appellant challenges the sufficiency of the evidence to support his conviction. We affirm.

## I. *Factual Background*

At the time of the murder, Soto resided in Big Spring with her daughter, Chelsea Fernandez, and Fernandez's boyfriend, Donald Barber. Appellant had also resided with them in the past. When Soto and Appellant ended their relationship—which occurred several weeks before she was murdered—she told Appellant that he could no longer reside with them and that he should not attempt to contact her. The locks to Soto's residence were also changed after Appellant moved out.

Barber testified that he was concerned about Appellant's behavior and fixation with Soto. Barber captured screenshots of certain Facebook postings made by Appellant, some of which were threatening. These postings referred to how Appellant had been "wronged," who Soto might be dating, and his intention to "get back [at Soto]." According to Barber, Appellant was angry because Soto was dating another person. The day before Soto's murder, Barber copied another Facebook posting made by Appellant that contained an image of two knives, one of which law enforcement later determined was the weapon that was used to murder Soto.

On the day of Soto's murder (July 20, 2021), Soto drove Barber to work—he was scheduled to work the nightshift at Whataburger. Barber asked Soto if she could pick him up when his shift ended at 11:00 p.m.; Soto agreed. Before doing so, and around that time, Soto took Fernandez to work. However, Soto never arrived to pick up Barber. Barber attempted to call Soto several times, but she never answered; eventually, Barber's mother picked him up from work and drove him home. Barber returned home shortly after midnight and found Soto lying on the living room floor; she had been stabbed several times and was dead. He immediately called 9-1-1 and reported Soto's death.

2

Detective Kevin King with the Big Spring Police Department was the lead investigator at the crime scene. Although Soto's body was discovered on the living room floor, Detective King believed that Soto had been murdered on the living room couch because of the amount of blood splatter on the couch, the amount of blood which had seeped into the couch's cushions, and the blood splatter located behind the couch. No other blood evidence was found in the house and there was no evidence of forced entry. Detective King also testified that Soto's cell phone could not be located and appeared to be the only item that was missing from the residence.

Based on statements made by Barber concerning the nature of Soto's relationship with Appellant and other information accumulated by law enforcement during their investigation, a warrant was obtained to search Appellant's residence in Big Spring. Officers with the Big Spring Police Department executed the warrant and seized a set of knives and their sheaths that were found in the living room close to where Appellant slept; DNA sample swabs from the seized knives and Appellant's bathroom were also collected.

Dr. Luisa Florez, a forensic pathologist, performed Soto's autopsy and noted that there were thirty-three stab wounds and lacerations on Soto's body; she characterized Soto's murder as "overkill" or a crime of passion. Dr. Florez testified that the knives (and their configuration) that were found in Appellant's residence were consistent with the stab wounds and other lacerations found on Soto's body. Dr. Florez also collected a sample of Soto's blood for DNA analysis and comparison.

Yahaira Romero, a forensic scientist with the Texas Department of Public Safety, performed DNA testing and comparison analysis on the knives and sheaths that were recovered from Appellant's residence. Two knives and their sheathes were tested for DNA profile identification. The first knife tested revealed a relatively low likelihood that Soto and Appellant were contributors to the blood stain that was found on the blade, although there was a relatively high link between Appellant and

the stain that was found on the sheath. However, test results indicated a much stronger DNA profile identification on the blood stains found on the second knife. The second knife, identified as WW2, contained three blood stains which were tested for DNA profile identification, two for which were informative. The test results for these two blood stains—stain no. 1 was located on the knife's blade and handle spike and stain no. 2 was located on the knife's handle—indicated there was a likelihood that Soto was a contributor to the DNA profile.

Appellant was interviewed by law enforcement investigators on several occasions and multiple statements were obtained. Sergeant John Haynes, a detective with Big Spring Police Department, interviewed Appellant twice. During these two interviews, Appellant explained that Soto's DNA was found on his person because, on the day she was murdered, Soto had gone to his residence, they hugged, and secretions of Soto's menstrual blood had accumulated underneath his fingernails during their encounter. However, Appellant later admitted to lying about this encounter and video footage from a nearby camera showed that this alleged encounter never occurred.

When Appellant testified, the State addressed certain inconsistencies in Appellant's statements. Appellant admitted to providing false statements to investigators about his whereabouts on the day of the murder, although he denied killing Soto. Appellant also conceded that he had a significant criminal history—felony convictions for theft, human trafficking, burglary of a habitation, and stalking. Appellant admitted that he harassed Soto in a threatening manner, as he did with other stalking victims. Appellant testified that he had been stalking Soto, following her, and calling her repeatedly since their separation. Appellant conceded that he was jealous because Soto was dating another person and he wanted to know the identity of Soto's current boyfriend so that he could confront him.

Appellant was aware that he was not welcome at Soto's residence. Yet, on the day of the murder, he went there anyway. According to Appellant, he was driving by Soto's house when he saw her vehicle moving toward him. Appellant made a U-turn and attempted to catch up to Soto before she went inside her home. He parked in front of her home, looked through a window, and saw her sitting on a couch holding her cell phone. Appellant testified that he then knocked on the front door and asked Soto if he could speak with her. In doing so, he attempted to open the front door, but it was locked. Soto told him that she did not want to speak with him and that she intended to call the police. Appellant then left Soto's residence and drove around for a while to calm down because he was upset and "in tears"; he later drove to a local convenience store.

Detective King reviewed video footage from the same local convenience store that Appellant drove to after leaving Soto's residence. The video footage shows Appellant entering this store at approximately 12:16 a.m. on the night of Soto's murder, placing something in a trash can, and then walking directly to the restroom.

Texas Ranger Tod Reed obtained and executed a search warrant for Appellant's vehicle. During the search, the back of a cell phone with a "zombie sticker" affixed to it was found inside the vehicle. Fernandez identified the piece of Soto's cell phone that was recovered from Appellant's vehicle. Fernandez testified that she had given this cell phone to Soto and had affixed the "zombie sticker" to the inside back piece of the phone which holds the phone's battery. According to Fernandez, Soto always kept her phone with her.

Ranger Reed also testified about a cell phone ping that was recorded near the time of Soto's murder. According to Ranger Reed, Appellant's cell phone and Soto's cell phone pinged simultaneously off a tower at or near a certain location; their cell phones pinged in the same location and at the same time—11:28 p.m. This indicated that their cell phones were in close proximity to each other on the night of

the murder. It was determined that this particular location was several blocks away from Soto's residence and was the last known location of Soto's cell phone.

## II. *Standard of Review – Sufficiency of the Evidence*

In his sole issue, Appellant contends that the evidence is legally insufficient to support his conviction. Specifically, Appellant contends that evidence of identity is lacking and does not support the jury's finding of guilt.

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict requires that we consider all of the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778. The *Jackson* standard is deferential and accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 732, *Clayton*, 235 S.W.3d at 778. We may not reevaluate the

weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, when the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326, *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13. It is not necessary that the evidence directly proves the defendant's guilt. Rather, circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor and can, without more, be sufficient to establish his guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13). A guilty verdict does not require that every fact must directly and independently prove a defendant's guilt. *Hooper*, 214 S.W.3d at 13. Instead, the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Id.* Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015).

### III. *Analysis*

As relevant to this appeal, a person commits the offense of murder if he intentionally or knowingly causes the death of an individual. PENAL § 19.02(b)(1). Identity is an essential element of any criminal offense; the State must prove beyond a reasonable doubt that the defendant is the person who committed, or was a participant in the commission of, the charged offense. *Johnson v. State*, 673 S.W.2d 190, 196 (Tex. Crim. App. 1984); *see Ruiz v. State*, 631 S.W.3d 841, 850–52 (Tex.

App.—Eastland 2021, pet. ref'd) (identity is an essential element of murder that must be proved beyond a reasonable doubt). In this case, Appellant complains that the evidence of identity that connects him to the murder is, at best, circumstantial. However, identity may be proven by direct *or* circumstantial evidence. *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986).

The record shows that the State adduced a variety of evidence, some of which or taken together, could arguably be characterized as circumstantial. Despite this, we are mindful that circumstantial evidence is as probative as direct evidence and can, alone, provide a sufficient basis to establish a defendant's guilt. *Carrizales*, 414 S.W.3d at 742 (citing *Hooper*, 214 S.W.3d at 13). Here, the evidence presented included, but is not limited to: (1) Appellant's admission that he stalked Soto and that he was present at Soto's residence on the night of the murder—which was close in time to when the murder was committed; (2) Appellant's admission that he observed Soto sitting on the couch in her living room in the same location where the physical evidence suggested that she was murdered; (3) Appellant's ongoing jealousy of and obsession with Soto after he and Soto separated; (4) Appellant's threatening messages to Soto and similar social media postings; (5) Appellant's attraction to and proclivity for using knives; (6) Appellant's social media posting that contained an image of two knives, one of which law enforcement later determined was the weapon that was used to murder Soto; (7) the DNA evidence found on one of the knives that belonged to and was retrieved from Appellant's residence, DNA testing of which indicated that Soto was a contributor to the DNA profile; (8) Dr. Florez's conclusions that the multiple stab wounds inflicted on Soto's body were consistent with the design of one of the knives found at Appellant's residence; (9) the only item missing from Soto's residence was her cell phone, a portion of which was found in Appellant's vehicle after the murder; (10) Appellant's motive for taking Soto's cell phone was because he was obsessed with her, stalked

8

her, and wanted to learn the identity of her new boyfriend so that he could confront him; (11) Appellant's cell phone and Soto's cell phone pinged simultaneously in the same location shortly before the murder; and (12) the inconsistencies between Appellant's statements to law enforcement and his trial testimony.

Considering the foregoing evidence, we conclude that a rational jury could have concluded beyond a reasonable doubt that the cumulative force and effect of this evidence, as well as all other evidence presented at trial, circumstantial or otherwise, was sufficient to find that Appellant was the person who murdered Soto. *See Villa*, 514 S.W.3d at 232; *Murray*, 457 S.W.3d at 448; *Hooper*, 214 S.W.3d at 13.

Although Appellant argues that there are "significant gaps" in the State's evidence, the jury was free to accept or reject Appellant's arguments and version of events. Inconsistent or untruthful statements by Appellant, of which there were many, may be considered by the jury as affirmative evidence of guilt. *See Gear v. State*, 340 S.W.3d 743, 747–48 (Tex. Crim. App. 2011); *Padilla v. State*, 326 S.W.3d 195, 201 (Tex. Crim. App. 2010). The jury, as in all cases, was free to judge the credibility and weight of all of the evidence presented, including Appellant's testimony and the statements that he made to law enforcement during his interviews with them. *See Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778. Indeed, and in light of Appellant's inconsistent statements and suspicious actions and conduct, the jury was entitled to reject and disbelieve all or a portion of Appellant's version of events.

If the evidence conflicts, we must presume that the jury resolved any conflicts in favor of the verdict, and we defer to the jury's determination in that regard. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. It is the jury's duty to resolve conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at

778.  Therefore, we resolve any conflicting inferences, if supported by the record, in favor of the jury's determinations.  *Jackson*, 443 U.S. at 326; *Merritt*, 368 S.W.3d at 525–26; *Clayton*, 235 S.W.3d at 778.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the State adduced sufficient evidence from which a rational trier of fact could have logically inferred and found beyond a reasonable doubt that Appellant committed the offense of murder as charged in the indictment. Accordingly, because legally sufficient evidence supports Appellant's conviction for the charged offense, we overrule Appellant's sole issue on appeal.

## IV.  *This Court's Ruling*

We affirm the judgment of the trial court.


W. STACY TROTTER

JUSTICE


February 15, 2024

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.